**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                  :
J. MICHAEL LIGHTNER,              :   CIVIL ACTION NO. 11-2007 (MLC)
                                  :
      Petitioner,                 :   MEMORANDUM OPINION
                                  :
      v.                          :
                                  :
1621 ROUTE 22 WEST OPERATING      :
COMPANY, LLC, d/b/a SOMERSET      :
VALLEY REHABILITATION AND         :
NURSING CENTER,                   :
                                  :
      Respondent.                 :
_____:
```

**COOPER, District Judge**

Petitioner, J. Michael Lightner, Regional Director of Region
22 of the National Labor Relations Board ("the Regional
Director"), brings this action against Respondent, 1621 Route 22
West Operating Company, LLC, doing business as Somerset Valley
Rehabilitation and Nursing Center ("Somerset Valley"), a long-
term care facility.  The Regional Director seeks two primary
forms of relief: (1) to enjoin Somerset Valley from engaging in
behavior that violates the National Labor Relations Act, 29
U.S.C. § 141, et seq. ("the Act"); and (2) to compel Somerset
Valley to reinstate the employment and restore the work schedules
of employees who are named in the Amended Petition.  (Dkt. entry
no. 27, Am. Petition.)[1]  He is joined by amicus, 1199SEIU United
Healthcare Workers East ("the Union").

_____

[1] The Regional Director docketed the "Amended Petition for
Temporary Injunction Under Section 10(j) of the National Labor
Relations Act, as Amended" as an Amended Complaint.

This matter arises from the facts attendant to the Union's organizing campaign at Somerset Valley and the subsequent union election.  As explained in greater detail below, the Union helped certain Somerset Valley employees garner support for a union election, file a petition for that election, and campaign in favor of unionizing the Somerset Valley workforce.[2]  At the September 2, 2010 union election, the Somerset Valley workforce voted in favor of unionization.

In August and September of 2010, the Regional Director filed unfair labor practice charges before the National Labor Relations Board ("the Board"), which he most recently amended in February of 2011.  Through those charges, the Regional Director asserts that Somerset Valley, after the petition was filed but before the September 2, 2010 election, violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) ("Section 8(a)(1)"), both by: (1) interrogating employees about Union support and activities; and (2) soliciting employees' grievances and impliedly promising benefits.  The Regional Director further asserts that Somerset Valley, after the election, violated Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3) ("Section 8(a)(3)"), by disciplining, reducing the hours worked by, and discharging employees who supported the Union.

---

[2] Although this matter pertains only to the bargaining unit recognized and agreed upon by the parties, the Court will refer to that unit as "the Somerset Valley workforce".

During the pendency of those administrative proceedings, the Regional Director commenced this action, seeking injunctive relief, i.e., relief during the pendency of the administrative and related appellate proceedings.  He asserts that he has "reasonable cause to believe" that Somerset Valley committed the alleged violations of the Act detailed in the unfair labor practice charges filed before the Board.  (Dkt. entry no. 27-1, Regional Director's Pre-hearing Br. at 19-26.)  He also argues that such relief is "just and proper" inasmuch as it will: (1) reassure Somerset Valley's employees that they may support the Union without fear of retaliation; (2) preserve the Union's ability to effectively represent those employees; and (3) remove any chilling effects caused by Somerset Valley's alleged violations of Section 8(a)(1) and Section 8(a)(3).

Somerset Valley denies that it violated Section 8(a)(1) and Section 8(a)(3).  It asserts, with respect to Section 8(a)(1), that Somerset Valley's administrative staff casually questioned employees about Union sympathies, and questioned employees about grievances without offering actual promises to remedy those grievances.  (See generally dkt. entry no. 25, Somerset Valley's Initial Pre-hearing Br.; see also dkt. entry no. 130, Tr. of Closing Arguments at 13-19.)  With respect to Section 8(a)(3), Somerset Valley admits that it disciplined, reduced the hours

worked by, and/or discharged the employees named in the Amended
Petition, but asserts that it took such action based on each
employee's job performance and its staffing needs. (Somerset
Valley's Initial Pre-hearing Br. at 17-21; Tr. of Closing
Arguments at 20-95.) It denies acting upon Union animus.
(Somerset Valley's Initial Pre-hearing Br. at 17-21; Tr. of
Closing Arguments at 20-95.) Somerset Valley further claims
that the relief now sought by the Regional Director does not
serve the public interest. (Somerset Valley's Initial Pre-
hearing Br. at 21-44.)

After the Regional Director commenced this action, the
parties appeared before Administrative Law Judge Steven Davis
("the ALJ") to argue the merits of the underlying unfair labor
practice charges. That hearing ("the ALJ Hearing") took place
over nineteen days between April 27, 2011 and June 28, 2011, and
yielded 272 exhibits and over 3,200 pages of transcripts.[3]
Pursuant to the parties' request, the Court has adopted the ALJ
Hearing record as part of the record in this matter. (See dkt.
entry no. 39, 6-9-11 Transcript at 55, 60-63, 102-104.) The
parties also appeared before the Court for a supplemental

_____

[3] The transcripts of the ALJ Hearing appear as docketed by
the Regional Director at docket entry numbers 35-1 through 35-7,
62-1 through 62-4, 56-1 through 56-7, and 62-5. Because these
transcripts are consecutively paginated, the Court accordingly
cites to them as "ALJ Hearing Transcript".

hearing, which was held during eight days between November 30, 2011 and February 9, 2012, and oral argument, which was held on March 13, 2012 and March 23, 2012.[4]

The Court has reviewed the record in its entirety, including the affidavits, declarations, and deposition transcripts provided by the parties (see, e.g., dkt. entry nos. 25-26); the transcript of and evidence adduced at the ALJ Hearing; the transcript of and evidence adduced at the supplemental hearing; and the Decision rendered by the ALJ (dkt. entry no. 81-1, ALJ Decision).  The Court has also considered the arguments presented by the Regional Director, the Union, and Somerset Valley.  Upon consideration of the foregoing, and as set forth at length below, the Court grants the Amended Petition in part and denies it in part.

## FINDINGS OF FACT

I.   **Somerset Valley and its Parent Company, CareOne, LLC**

A.   <u>The Facility</u>

Somerset Valley is a healthcare facility that provides rehabilitative and long-term, clinical care to patients who, in many cases, cannot care for themselves.  (Dkt. entry no. 25-14,

---

[4] The transcripts of the supplemental hearing appear at docket entry numbers 92, 94, 96, 101, 113, 115, 117, and 124. As a whole, they are not consecutively paginated.  The Court accordingly cites to these transcripts as: dkt. entry no. 92, SH Transcript; dkt. entry no. 94, SH Transcript 2; dkt. entry no. 96, SH Transcript 3; dkt. entry no. 101, SH Transcript 4; dkt. entry no. 113, SH Transcript 5; dkt. entry no. 115, SH Transcript 6; dkt. entry no. 117, SH Transcript 7; and dkt entry no. 124, SH Transcript 8.

Illis Decl. at ¶ 2; dkt. entry no. 35-10, GC Ex. 1.)[5]  Its facility contains thirty-two patient rooms, each containing two beds; it thus has a maximum occupancy of sixty-four patients. (See ALJ Hearing Transcript at 1404.)   As a healthcare facility, Somerset Valley is subject to both New Jersey and federal health regulations.  (See, e.g., SH Transcript 2 at 102-03.)

 B. Somerset Valley's Parent Company, CareOne, LLC

 Somerset Valley is owned by CareOne, LLC ("CareOne").  (ALJ Hearing Transcript at 1403-04.)  CareOne, during the periods relevant to this action, employed Jason Hutchens as its Regional Director of Operations and Andrea Lee as its Vice President of Human Resources.  (Id. at 78, 1403-04.)  Hutchens and Lee, in their respective positions, oversaw operations at Somerset Valley and other CareOne facilities.  (Id.)

 Between November of 2009 and May of 2011, CareOne also employed Jackie Engram as its Vice President of Clinical Operations.  (Id. at 1841-42.)  Engram, in this role, oversaw the nursing departments in CareOne's New Jersey facilities.  (Id.) In January of 2011, Engram also assumed responsibilities as Somerset Valley's acting Director of Nursing ("DON").  (Id. at 1845.)[6]

---

[5] Somerset Valley admits that it is both "an employer engaged in commerce" and a "health care institution".  (ALJ Decision at 2.)  See also 29 U.S.C. §§ 152(2), (6), (7), (14).

[6] Between January and May of 2011, Engram thus held both positions.  (ALJ Hearing Transcript at 1845.)

C.   Somerset Valley's Employees

Somerset Valley, during the periods relevant to this action, employed, inter alia, six categories of employees: (1) an administrator; (2) a DON; (3) unit managers; (4) nurses (including registered nurses ("RNs") and licensed practical nurses ("LPNs")); (5) certified nurse's aides ("CNAs"); and (6) a staffing coordinator.  (See id. at 899-900, 1185-86, 1405-07, 1993, 2663.)[7]  The administrator, DON, and unit manager work together to supervise the nurses, CNAs, and the staffing coordinator.  (Id. at 1991-2226, 2664.)

The administrator, who sits atop the management hierarchy, reports to CareOne, ensures that the facility meets state and federal regulations, and supervises all of the departments at Somerset Valley, including those directly responsible for patient care.  (Id. at 2664.)  The DON reports to the administrator,

_____

[7] Somerset Valley, in October of 2011, changed its clinical staffing model such that it no longer employs LPNs.  (Dkt. entry no. 83, Somerset Valley's Hearing Br. at 3; dkt. entry no. 83-1, Hoffman Decl. at ¶¶ 2-3.; see also SH Transcript 2 at 78.)  Because Somerset Valley enacted such changes without the Regional Director's prior knowledge or consent, the Regional Director now alleges that Somerset Valley improperly eliminated a segment of the Somerset Valley workforce.  He has thus filed new unfair labor practice charges before the Board.  (See dkt. entry no. 97, SH Transcript 3 Sidebar Confs. at 3; dkt. entry no. 116, SH Transcript 5 Sidebar Confs. at 7-8.)
The Amended Petition does not incorporate the new unfair labor practice charges, and Somerset Valley's changes to its clinical staffing model do not control the resolution of this matter.  The Court accordingly notes but does not further address that issue in this Memorandum Opinion.

directly oversees clinical services and, in that capacity, ensures both that the facility is adequately staffed with nurses and CNAs, and that such employees provide adequate patient care. (See generally id. at 1991-2226.)  The unit manager, who represents the lowest level of management in this hierarchy, reports to the DON, directly supervises the nursing employees, and ensures adequate patient care.  (Id. at 900; dkt. entry no. 26-1, Southgate Aff. at ¶ 1.)

The Somerset Valley nursing employees attend to Somerset Valley's patients' medical needs and assist those patients with daily living activities.  During the periods relevant to this petition, RNs and LPNs administered medication and recorded such administration on Medication Administration Records ("MARs"); they similarly administered treatment, e.g., lotions, salves, and bandages, and recorded administration of such treatments on Treatment Administration Records ("TARs").  (ALJ Hearing Transcript at 162-63, 277, 908-09, 982, 2014-17.)  Nurses also transcribed doctors' orders for medication and treatment onto patients' MARs and TARs, communicated with doctors and pharmacies, and documented incidents that might affect patient care, such as new admissions, falls, or new medical symptoms. (See, e.g., id. at 451-54, 586, 601, 909-11, 2505-07.)  CNAs assisted patients with daily living activities by, inter alia, distributing food, helping patients eat, and cleaning patients.

(See, e.g., dkt. entry no. 26-9, Aguilar Aff. at ¶ 1; dkt. entry
no. 26-14, Onyeike Aff. at ¶ 1.)

Somerset Valley refers to its nursing staff by employees'
respective level of education (i.e., RN, LPN, or CNA), scheduled
shift, and employment status.  Nurses and CNAs typically work on
one of three shifts: (1) the morning shift (from 6:45 a.m. to
3:15 p.m., sometimes referred to as the 7-3 shift); (2) the
evening shift (from 2:45 p.m. to 11:15 p.m., sometimes referred
to as the 3-11 shift); or (3) the night shift (from 10:45 p.m. to
7:15 a.m., sometimes referred to as the 11-7 shift).  (See ALJ
Hearing Transcript at 1407.)  Nursing employees, based on their
weekly schedules, also fit into one of four employment status
categories: (1) full-time, for nurses who work forty or more
hours per week; (2) part-time with benefits, for nurses who work
at least twenty-four but less than forty hours per week;
(3) part-time without benefits, for nurses who work regularly but
work less than twenty-four hours per week; or (4) per diem, for
employees who work only on an as-needed basis.  (Id. at 1405-07.)
Because per diem employees are essentially "on-call" -- because
they do not have set schedules -- they earn more money per hour
than their full- and part-time counterparts.  (Id. at 1407.)

Somerset Valley's staffing coordinator creates, updates, and
maintains the nursing staff's "Master Schedule".  (Id. at 1186.)
The Master Schedule is a four-week schedule created in Somerset

9

Valley's computerized scheduling, payroll, and labor management system, "SmartLinks".  (Id. at 1198-1202, 1711-12, 2885; SH Transcript 2 at 91.)

The staffing coordinator must carefully key employee schedules into SmartLinks because the information in SmartLinks informs other Somerset Valley and CareOne systems.  For example, the information keyed into the Master Schedule informs and controls employees' ability to punch in or out at the employee time clock.  (ALJ Hearing Transcript at 1243, 1694, 1699-1700.) The time clock, when used by employees whose hours are not correctly entered in the Master Schedule, will display an error message.  (Id. at 1243; SH Transcript 2 at 87-89.)  An affected employee must then decide whether to work without punching in, thus creating a need for time card and payroll edits, or interrupt a nursing manager to manually override the system. (ALJ Hearing Transcript at 1243, 1694, 1699-1700; SH Transcript 2 at 89.)

The information keyed into SmartLinks also informs other CareOne and Somerset Valley reports and decision-making processes.  Managers working for both Somerset Valley and CareOne can access SmartLinks remotely, working from any computer with an internet connection.  (ALJ Hearing Transcript at 1695.) Management can thus use the information in SmartLinks to analyze labor costs, forecast hiring and scheduling needs, or address payroll issues.  (Id. at 1694.)

10

## II.  **The 2009 State Survey**

The New Jersey Department of Health and Senior Services ("NJDHSS") visited Somerset Valley in the fall of 2009 to conduct an annual inspection for compliance with state and federal regulations ("State Survey").  (See Illis Decl. at ¶¶ 5-7; see also ALJ Hearing Transcript at 378, 596, 1423-35.)

During a typical State Survey, NJDHSS scrutinizes the nursing department by examining charts, interviewing employees and patients, and, generally, inspecting all aspects of a facility's nursing operations.  (ALJ Hearing Transcript at 1423-24.)  If during the State Survey NJDHSS discovers violations of state or federal regulations, it takes two steps.  First, it issues a report noting each "deficiency", i.e., each violation of the regulations, indicating the scope and severity of the violation.  (Id. at 1425-26.)  Second, it penalizes the inspected facility by, inter alia, issuing fines and requiring the facility to take remedial steps to cure the deficiency cited in the NJDHSS report.  (Id.)

Upon the completion of the 2009 State Survey, NJDHSS noted that Somerset Valley violated several regulations.  (See, e.g., id. at 1423-35.)  NJDHSS noted, for example, that Somerset Valley failed to properly assess the pain experienced by a newly admitted rectal cancer patient; NJDHSS also noted that Somerset Valley failed to document the administration of medications.

11

(Id. at 1423-35; Illis Decl. at ¶¶ 5-7.)  Based on these and other violations, NJDHSS cited Somerset Valley for several "D-level" deficiencies and two "G-level" deficiencies. (ALJ Hearing Transcript at 1425-26; dkt. entry no. 59-1, Resp. Ex. 33.)  Such a G-level deficiency indicates that a patient suffered actual harm during and because of the care rendered at Somerset Valley.  (ALJ Hearing Transcript at 1424-25.)  NJDHSS thus required Somerset Valley to submit a written plan of correction, notified Somerset Valley that it would reinspect the facility, and, ultimately, recommended a $5,400 fine.  (Id. at 1435-37.)

Somerset Valley submitted a written plan of correction in December of 2009, addressing the deficiencies noted in the 2009 report.  (Id. at 1435-36.)  NJDHSS accepted that plan and reinspected Somerset Valley's facility in January of 2010.  (Id. at 1436-37.)  Upon reinspection, NJDHSS found that Somerset Valley substantially complied with state and federal regulations. (Id. at 1435-38.)

Hutchens testified at the ALJ Hearing that, as a result of the 2009 State Survey, there was "increased scrutiny on the nursing department in [Somerset Valley].  Increased observation of what the director of nursing was doing and what the nurses themselves were doing.  And a higher level of accountability from the administrator and the DON . . . for the nursing staff." (Id. at 1449.)  He also testified that such increased scrutiny led him

12

to question the ability of Somerset Valley's administrator, Elizabeth Heedles, and its DON, Kamala Kovacs, to effectively manage Somerset Valley's nursing staff.  (Id. at 1422, 1452-55.)

## III. Scheduling Changes at Somerset Valley Caused Employees to Seek Union Representation

In May of 2010, Heedles informed the Somerset Valley nurses and CNAs of proposed scheduling changes that would take effect on August 1, 2010. (Id. at 38, 42, 192, 288, 1221-22; dkt. entry no. 25-4, Napolitano Dep. at 42-46.)  If adopted, these changes would have caused many nurses and CNAs to lose regularly scheduled hours and the status, pay, and benefits associated with those hours.  (ALJ Hearing Transcript at 38, 42, 192, 288, 1221-22.) For example, Sheena Claudio, a full-time LPN who worked during the morning shift, was informed that she would either have to switch to the evening shift or work on a per diem basis.  (Id. at 42-44, 192.; dkt. entry no. 25-2, Claudio Dep. at 10-11.) Because the evening shift conflicted with her child care responsibilities, Claudio would have been forced to work on a per diem basis, thereby losing hours, pay, and the health benefits that she enjoyed as a full-time employee.  (See Claudio Dep. at 10-11.)  Other employees, such as Shannon Napolitano, a full-time LPN who worked during the morning shift, and Jillian Jacques, a full-time LPN who worked during the evening shift, faced similar challenges. (ALJ Hearing Transcript at 289-91, 487-88; Napolitano Dep. at 46.)

Napolitano, Claudio, Jacques, and other employees expressed concern about the proposed changes.  Some employees reached out to CareOne by calling the "CareOne hotline", a phone number dedicated to patient and employee grievances.  (ALJ Hearing Transcript at 297-99, 923-25.)  Jacques called CareOne and spoke directly to Lee, who told Jacques that she was generally aware of proposed scheduling changes but unaware of the extent and effect of such changes.  (<u>Id.</u> at 45-46, 487-89.)  Lee also told Jacques that she would investigate the matter.  (<u>Id.</u>)

Lee thereafter visited Somerset Valley in June of 2010 and met with approximately ten employees, including Napolitano, Claudio, and Jacques.  (<u>Id.</u> at 47-49, 190-91, 301-03, 491-93.)  Because Lee explained during that meeting that she was only generally aware of the scheduling issues, Claudio gave Lee a memorandum from Heedles that outlined Heedles' proposed changes.  Other employees spoke to Lee about the proposed changes, related staffing issues, and low employee morale.  (<u>Id.</u> at 49-50, 301-02.)  At the end of the meeting, Lee again expressed, as she had to Jacques, that she had been unaware of the extent and effect of the proposed scheduling changes, and that she would investigate the employees' complaints.  (<u>Id.</u> at 50, 301-03.)  Lee failed, however, to follow up with Jacques, Claudio, or any of the other Somerset Valley employees.  (<u>Id.</u> at 50.)

Shortly after Lee's visit, Napolitano and Claudio began
speaking to their co-workers about unionizing the Somerset Valley
workforce.  (Id. at 44-45, 51, 293-95, 486, 926-27, 1189-90;
Napolitano Dep. at 50, 62; dkt. entry no. 25-6, Tyler Dep. at
52-53, 55.)  They also distributed an informal petition, calling
for employee support for unionization.  (ALJ Hearing Transcript
at 53-54, 304-06.)  Claudio thereafter called the Union and left
a message for Union organizer Brian Walsh, explaining the
Somerset Valley employees' concerns and expressing their interest
in Union representation.  (Id. at 51-52, 287-88, 296; SH
Transcript at 9.)

**IV.  The Union Organizing Campaign at Somerset Valley**

A.   Walsh's First Meeting with Somerset Valley Employees

Walsh met Napolitano and Claudio in late June of 2010 at a
restaurant located near Somerset Valley.  (ALJ Hearing Transcript
at 52-53; SH Transcript 1 at 9-10.)  Napolitano and Claudio
showed Walsh their informal petition and, generally, provided
information about Somerset Valley, Somerset Valley's employees,
and the issues faced by those employees.  (ALJ Hearing Transcript
at 53, 304-05; SH Transcript at 9-10.)  At the conclusion of the
meeting, Walsh, Napolitano, and Claudio scheduled a second
meeting and discussed the need to involve more Somerset Valley
employees.  (ALJ Hearing Transcript at 53, 55, 304; SH Transcript
at 10.)

15

Napolitano and Claudio returned to Somerset Valley, informed their co-workers of their meeting with Walsh, and invited them to attend the second meeting.  (ALJ Hearing Transcript at 57-58, 66-68, 308-10, 494-95, 862-63, 1189-90, 2625-30; dkt. entry no. 26-2, Jacques Aff. at ¶ 2; dkt. entry no. 26-10 Jarbo Aff. at ¶ 2.) Jacques assisted their effort by informing employees who worked during the evening shift.  (ALJ Hearing Transcript at 68, 764; dkt. entry no. 26-18, Lopez Aff. at ¶ 2.)  Word of the meeting spread throughout the Somerset Valley workforce.  (See, e.g., ALJ Hearing Transcript at 309, 764-65.)  At least fifteen employees thus knew of Napolitano's and Claudio's union organizing efforts by the end of June of 2010, including LPN Jacquie Southgate and scheduling coordinator Valarie Wells.  (See id. at 57-58, 66-68, 308-10, 494-95, 764-65, 862-63, 1189-90, 2625-30; Jacques Aff. at ¶ 2; Jarbo Aff. at ¶ 2; Lopez Aff. at ¶ 2.)

To assist the organizing campaign, Napolitano approached receptionist Sheena Orozco and requested a list of all of the employees who worked at Somerset Valley.  (ALJ Hearing Transcript at 306, 2631-32.)  Although Orozco could not access a full employee roster, she gave Napolitano a list of Somerset Valley's employees that she produced from memory.  (Id. at 2631-32.)

B.  Walsh's Second Meeting with Somerset Valley Employees

Walsh held a second meeting with Somerset Valley employees, including Napolitano, Claudio, Jacques, and several per diem

16

employees, approximately one week after the first meeting.  (Id. at 56, 307-08, 495; SH Transcript at 10-11.)  At the second meeting, Walsh explained the Union's role in the union organization process and stressed the need for the support of the majority of the Somerset Valley workforce.  (ALJ Hearing Transcript at 56-57, 496.)  He explained that they could petition the Regional Director for a union election after they had collected signed authorization cards from at least seventy percent of the Somerset Valley workforce.  (ALJ Hearing Transcript at 496; dkt. entry no. 26-8, Walsh Aff. at ¶ 4.)

To assist their marketing efforts, Walsh, using the information that Napolitano obtained from Orozco, helped the employees that attended this meeting construct a chart listing Somerset Valley's employees.  This chart identified department leaders, employees who supported the Union, and employees who might support the Union.  (ALJ Hearing Transcript at 57, 62, 239-41, 308.)  Walsh also designated Napolitano, Claudio, and Jacques as the "union organizing committee", i.e., as "the leaders of the campaign."  (SH Transcript at 11, 135, 168.)  He gave them disposable cameras and asked them to take pictures of employees who supported the Union, for use in Union marketing materials.  (See id. at 75-76, 311-12; Napolitano Dep. at ¶¶ 60-61.)  He asked them, and asked the other employees at the meeting, to talk to other Somerset Valley employees about the union organization

process, to distribute authorization cards, and to collect the signed authorization cards. (ALJ Hearing Transcript at 495; SH Transcript at 11.)

    C.   <u>Distribution and Collection of Authorization Cards</u>

Napolitano, Claudio, and Jacques distributed the authorization cards at Somerset Valley in the break room, at nursing carts, at the nurses' station, and in the parking lot. (ALJ Hearing Transcript at 73-74, 312, 316, 501, 821-22; SH Transcript at 168-72.) Within three weeks, fifty-two Somerset Valley employees signed and returned authorization cards to the Union. (Walsh Aff. at ¶ 4; <u>see also</u> ALJ Hearing Transcript at 72, 76, 314-16, 501, 504, 824, 1009, 1144-48 (demonstrating that Napolitano, Claudio, Jacques, per diem CNA Daisy Aguilar, per diem CNA Gertrudis Rodriguez, secretary Lynette Tyler, and others signed authorization cards); dkt. entry no. 26-12, Joseph Aff. at ¶ 3 (same, with respect to per diem CNA Dominique Joseph); dkt. entry no. 26-16, Stubbs Aff. at ¶ 2 (same, with respect to per diem CNA Annie Stubbs); Lopez Aff. at ¶ 3 (same, with respect to full-time CNA Grace Lopez).) These fifty-two employees represented approximately eighty percent of the Somerset Valley workforce. (<u>See</u> Walsh Aff. at ¶ 4.)

    D.   <u>Communication with Somerset Valley Management Personnel</u>

Napolitano, Claudio, and Jacques testified that they were uncertain whether the acting Somerset Valley administrator and

DON knew of the organizing effort.  (See, e.g., ALJ Hearing Transcript at 273.)  Claudio testified, however, that she regularly shared information about the organizing campaign with Southgate.  (Id. at 273, 279-80.)  Southgate regularly asked about the organizing campaign's progress and whether Napolitano, Claudio, and Jacques had collected enough authorization cards to file a petition for a union election.  (Id. at 279-80.)

     E.   Filing the Union Petition

Napolitano sent messages to Southgate and other Somerset Valley employees on July 22, 2010, notifying them that she intended to file a petition for a union election later that day. (ALJ Hearing Transcript at 331-32.)  Napolitano, Jacques, and Walsh, inter alios, went to the Board and filed the petition that afternoon.  (Id. at 331, 511.)

Somerset Valley received notice of the petition on or about July 28, 2010.  (Id. at 1459.)  Heedles thereafter distributed a memorandum to Somerset Valley's employees, notifying them that Somerset Valley had received notice of the petition and informing them that Somerset Valley would begin holding meetings with the employees to discuss issues related to union representation. (Jacques Aff. at ¶ 5; dkt. entry no. 35-10, GC Ex. 9.)

## V.   Somerset Valley Instituted Organizational / Management Changes Following the Filing of the Petition

Hutchens and Lee visited and met with employees at Somerset Valley soon after receiving notice of the petition.  They

informed the employees that they had transferred Heedles to another CareOne facility because they recognized issues at Somerset Valley.  (ALJ Hearing Transcript at 337-38, 512-13, 1469-72.)  Hutchens then introduced Somerset Valley's new administrator, Doreen Illis.  (Id.)

Somerset Valley soon announced other organizational changes, terminating Kovacs's employment and transferring the unit manager to a different facility.  In their place, Somerset Valley hired Inez Konjoh as the new DON and promoted Southgate to unit manager.  (Id. at 67-68, 194-95, 338-41, 1993, 2683.)

## VI. The Union and Somerset Valley Electioneer for the Votes of the Somerset Valley Workforce

In the period after the petition was filed and before the September 2, 2010 union election, both the Union supporters and Somerset Valley actively electioneered for the votes of the Somerset Valley workforce.  The Court endeavors, here, to summarize these efforts with appropriate citation to the record.

### A.   Ongoing Union Meetings and Communication

During the election campaign, Walsh held regular Union meetings at area restaurants, at hotels, and in employees' homes. (Id. at 77-79, 317-18, 825, 1008; SH Transcript at 15-17.)  Each meeting was held in two shifts, thus allowing Somerset Valley employees to attend meetings without interrupting their work schedules.  (See ALJ Hearing Transcript at 319; dkt. entry no. 26-8, Walsh Aff. at ¶ 5.)  Attendance fluctuated; generally,

however, between fifteen and twenty employees attended each meeting.  (ALJ Hearing Transcript at 77-79; SH Transcript at 119-22.)[8]

Walsh and other Union employees also regularly called and visited Somerset Valley employees.  (SH Transcript at 25-26, 29-30; dkt. entry no. 26-19, Venette Aff. at ¶ 2.)  Using information gathered from the authorization cards and the Excelsior List, Walsh communicated information about the Union and the upcoming election both in phone and face-to-face.  (Id.)[9]

B.   Pro-Union Leaflets and Materials

1.   The "Talking Heads Piece"

In late August of 2010, the Union distributed copies of a two page leaflet featuring pictures of and quotes attributed to Somerset Valley employees who supported the Union (the "Talking Heads Piece").  (See dkt. entry no. 35-10, GC Ex. 10; SH Transcript at 31-32.)  The Union mailed a copy of the Talking Heads Piece to all of the Somerset Valley employees whose names appear on the Excelsior List.  (SH Transcript at 31-32.)  On the

---

[8] Walsh maintained sign-in sheets for each meeting.  (SH Transcript at 17-22; see also Supplemental Hearing Exhibit ("SH Ex.") P-1.)

[9] An Excelsior List, named for Excelsior Underwear, Inc., 156 NLRB 1236 (1966), contains information about bargaining unit employees.  Such a list typically contains the names and home addresses of such employees.  See 156 NLRB at 1240-42.  (See also SH Transcript at 32; dkt. entry no. 38-2, Excelsior List.)

first page, the Talking Heads Piece proclaims, "We're Voting Yes for 1199SEIU!"  (GC Ex. 10.)[10]  The first page also describes the Union as "[t]he strongest, most effective union for nursing home workers in upstate New York and through the country".  (Id.)  On the second page, it states, "Our Opportunity to Vote Yes is Here!"  (Id.)[11]

Napolitano, Jacques, Wells, Stubbs, and Rodriguez are among the Somerset Valley employees whose pictures appear in this leaflet.  (Id.; see ALJ Hearing Transcript at 88-89, 508, 826-27, 862, 1009, 1194-95.)  Each picture is accompanied by a quote, attributed to that employee, that demonstrates her support for the Union.  (GC Ex. 10.)  Napolitano, for example, is quoted as stating, "I'm voting yes for better health insurance and job security."  (Id.)  Quotes attributed to Wells, Jacques, Stubbs, and Rodriguez demonstrate similar Union support.  (Id.)

2.   The Union's YouTube Video

During a meeting at Jacques's home, Walsh and several of the Somerset Valley employees recorded a video demonstrating Somerset Valley employees' support for the Union (the "YouTube Video").  (GC Ex. 11; ALJ Hearing Transcript at 505-509; SH Transcript at

---

[10] The Talking Heads Piece also proclaims, "Vamos a Votar sí por 1199SEIU!"  (GC Ex. 10.)

[11] The Talking Heads Piece also states, "Nuestra oportunidad de votar Sí está aquí!"  (GC Ex. 10.)

31-32.)[12]  Wells, Claudio, Jacques, and several other nurses and
CNAs appear in the YouTube Video, expressing their desire for
Union representation and the rationale supporting their position.
(GC Ex. 11; ALJ Transcript Hearing at 90-91, 508, 1010, 1194-95.)

The YouTube Video was uploaded onto YouTube.com
approximately two weeks before the election.  (ALJ Hearing
Transcript at 1362.)  Shortly before the election, copies were
also mailed to the Somerset Valley employees whose names appear
on the Excelsior List.  (Id.; SH Transcript at 31-32.)

   3.   Union Stickers and Bracelets

During the election campaign, Walsh distributed stickers
that the nurses and CNAs could wear to demonstrate Union support.
(See ALJ Hearing Transcript at 319, 506.)  The stickers were
purple and contained two blocks of text.  (Id. at 193; dkt. entry
no. 35-10, GC Ex. 8.)  The first block of text was printed in
large, yellow letters and stated, "Respect".  (ALJ Hearing
Transcript at 193; GC Ex. 8.)  Below that, in smaller, white
letters, the second block of text stated, "Nursing Home Workers
Uniting for Quality Care and Quality Jobs 1199SEIU".  (ALJ
Hearing Transcript at 193; GC Ex. 8.)

---

   [12] GC Ex. 12 is a digital video recording the YouTube video.
Because GC Ex. 12 constitutes physical evidence, it has not been
docketed.  As noted in the text, however, this video also
appeared on YouTube.  On YouTube, it was broken into two parts.
See CareOne Workers Speak Out, YOUTUBE.COM,
http://www.youtube.com/watch?v=O3fJNtBiu8M (last visited Apr. 12,
2012); CareOne Workers Speak Out PART II, YOUTUBE.COM,
http://www.youtube.com/watch?v=5sVo5IXzh8I (last visited Apr. 12,
2012).

Approximately twenty nurses and CNAs, including Napolitano, Claudio, and Jacques, wore the stickers during the campaign. (ALJ Hearing Transcript at 85, 193, 319-20, 506, 615.)  Jacques wore it on the left side of her chest; Napolitano wore it on her left shoulder.  (ALJ Hearing Transcript at 319, 506.)

          4.   Materials Distributed by the Union at the Bottom of the Somerset Valley Driveway

Somerset Valley generally prohibited Union employees from entering the Somerset Valley grounds.  (SH Transcript at 14.) Approximately two weeks before the election, however, Walsh and other Union employees visited Somerset Valley during the afternoon shift change, _i.e._, between 2:45 p.m. and 3:15 p.m., to distribute fliers and ensure that the Union was visible to the Somerset Valley workforce.  (_Id._ at 36-37; Venette Aff. at ¶ 2.) They stood at the bottom of Somerset Valley's driveway, in the shoulder of U.S. Route 22, distributing fliers to any employees who would stop and open their car windows.  (SH Transcript at 36-37; Venette Aff. at ¶ 2.)  After a short time, police arrived, told the Union employees that their distribution posed a safety hazard, and asked them to leave.  (Venette Aff. at ¶ 2.)

Because Walsh generally lacked access to the Somerset Valley grounds, he relied upon Napolitano, Claudio, and Jacques to distribute literature to the other Somerset Valley employees. (SH Transcript at 14-15.)

C.   <u>Somerset Valley's Meetings with its Employees</u>

    1.   Description of Meetings

Somerset Valley hosted three additional staff meetings in July and August of 2010 to discuss matters relating to the pending union election.  (<u>See</u> ALJ Hearing Transcript at 101-03, 512, 688, 766, 864-66, 1027-28, 1201, 2647-55, 3089; Lopez Aff. at ¶ 6; Tyler Dep. at 110-15.)  Employee attendance at these meetings was mandatory.  (ALJ Hearing Transcript at 334, 512; Lopez Aff. at ¶ 2.)

Hutchens and Lee attended and spoke at the first meeting. (ALJ Hearing Transcript at 101-03, 333-34, 766; Tyler Dep. at 111-15, 1459-60.)[13]  Before it began, Joseph, believing that Lee worked for the Union, approached Lee and spoke openly about her support for the Union.  (<u>Id.</u> at 767-68.)

Hutchens thereafter opened the meeting by introducing himself and Lee to the staff, and expressing his disappointment that the employees filed a petition for a union election.  (<u>Id.</u> at 336; Tyler Dep. at 111.)  Lee then spoke to the employees, stating that Somerset Valley preferred to remain a union-free environment.  (ALJ Hearing Transcript at 101-02, 1013-14; Tyler Dep. at 112-15.)  She informed the employees that, in future

---

[13] Although referred to as one meeting, it actually consisted of several smaller meetings held throughout the workday, thus allowing employees from all shifts to attend. (ALJ Hearing Transcript at 1459-60, 3089.)

meetings, Somerset Valley would campaign for their support, would play videos and otherwise distribute information about the Union, and afford the employees an opportunity to ask questions.  (ALJ Hearing Transcript at 101-03, 336.)  Lee also encouraged employees to approach management to discuss whatever changes the employees felt were necessary.  (Id. at 1013-14.)

Hutchens and Illis attended and spoke at the second meeting.  (Id. at 103-04, 769-772.)  Hutchens stated at the outset of the meeting that he did not want to discuss the Union but, instead, wished to discuss the employees' issues and concerns.  (Id. at 341-42, 1475.)  Both Hutchens and Illis asked the employees to give management an opportunity to resolve the employees' issues and to "turn things around".  (Id. at 105, 515, 1021.)  Hutchens noted, however, that it would be illegal for him to make immediate changes.  (Id. at 343.)

Claudio, Tyler, and others spoke at the meeting, raising individual concerns.  (Id. at 104-06, 341-43, 865-88, 1014-18.)  Claudio, for example, stated that CareOne earlier failed to respond to the employees' complaints about Heedles and about Heedles's proposed schedule changes.  (Id. at 105-06.)  Stubbs told Hutchens that the staff needed but lacked access to plastic bags used to dispose of dirty linens. (Id. at 865.)

Hutchens and Illis took action upon the employees' complaints.  During the meeting, Hutchens told employees to

26

contact him directly if they needed to discuss issues.  (Id. at
106-07.)   Furthermore, he posted notices at Somerset Valley,
listing his cellular telephone number, Illis's cellular telephone
number, and contact information for other CareOne
representatives.  (Id.)   Hutchens also directed Illis to
distribute the plastic bags that Stubbs spoke of to the
employees, and Illis distributed them during the next morning
shift.  (Id. at 865, 1472-73.)[14]

   Hutchens returned to Somerset Valley shortly before the
election with Chris Foglio, CareOne's Chief Executive Officer.
They met with the employees in the Somerset Valley sunroom.  (Id.
at 1027-28, 2348-50, 2653-55, 2090.)   Hutchens assured the
employees that Somerset Valley would not retaliate against
individual employees if they voted in favor of the Union.  (Id.
at 2654.)   Foglio spoke about benefits that CareOne provided or
planned to provide for Somerset Valley employees, including
tuition reimbursement and low-cost housing.  (Id. at 1027-28,
2348-50.)

---

[14] Illis, at the ALJ Hearing, expressly denied soliciting
grievances from or making promises to any of the Somerset Valley
employees.  (Id. at 2691-92.)  The ALJ discredited such testimony
in light of the employees' testimony that Illis distributed these
bags.  (ALJ Decision at 39, 41.)  The Court, here, does not
render an opinion on Illis's credibility but merely notes the
discrepancy in the record.

2.   Anti-Union Videos and Printed Materials

Before the union election, Somerset Valley and CareOne management representatives played anti-union videos for and distributed anti-union literature to the Somerset Valley workforce.  (See, e.g., ALJ Hearing Transcript at 770, 865-66; Lopez Aff. at ¶ 6.)  Somerset Valley also posted anti-union literature in the employees' break room, in the medication room, and in corridors throughout the facility.  (Id. at 544-49.) These videos and literature highlighted the negative aspects of union representation.  (See, e.g., dkt. entry nos. 35-13 to 35-14, GC Ex. 41; dkt. entry no. 35-14, GC Ex. 42.)[15]

3.   Somerset Valley's Meetings Amongst Management
     Personnel

Somerset Valley management personnel, including Hutchens, Lee, Illis, Konjoh, and Southgate, met regularly during the campaign period to discuss Somerset Valley's electioneering efforts.  (ALJ Hearing Transcript at 942-52, 3081-88; Southgate Aff. at 3.)  The management personnel discussed the disadvantages of working at a unionized facility and how best to communicate such disadvantages to the Somerset Valley workforce.  (ALJ Hearing Transcript at 945-46.)

Management personnel, when meeting, often met with Patrick Fleming, an attorney acting as a legal and human resources

---

[15] GC Ex. 41 is split between docket entry numbers 35-13 and 35-14.  GC Ex. 42 appears only at docket entry number 35-14.

consultant.  (Id. at 945, 3079-88.)  Fleming counseled Somerset
Valley's management regarding what constituted acceptable or
unacceptable communication with Somerset Valley's employees
during the election campaign.  (Id. at 945-47.)  Fleming also
reviewed the Excelsior List with management, to determine which
employees supported management and which supported the Union.
(Id. at 947-52.)  Southgate testified at the ALJ Hearing that, to
that end, Somerset Valley management identified Claudio, Tyler,
Stubbs, and Jacques as Union supporters.  (Id. at 948-50.)
Southgate also testified that the Somerset Valley managers were
aware of and discussed the Talking Heads Piece and the YouTube
video.  (Id. at 951-52.)  At the ALJ Hearing, Illis confirmed
that she received and reviewed the Talking Heads Piece and was
aware of the YouTube video before the election.  (Id. at 3099-
101.)[16]

> 4.   Somerset Valley Management Questioned Employees
>      About Union Sympathies and the Upcoming Election

Fleming instructed Somerset Valley's management to approach
employees and convey information about the disadvantages of union
representation, to question them about Union sympathies, and to
attempt to convince them to vote against unionization in the

---

[16] Illis denied knowing that specific employees supported
the Union.  (See ALJ Hearing Transcript at 3098-99.)  Such
testimony, however, conflicted with both: (1) her admission that
she saw the Talking Heads Piece; and (2) Southgate's testimony,
as detailed above.  (See id. at 948-52, 3099-3101.)

election.   (Id. at 946; Southgate Aff. at 5.)   Southgate
testified:

        A      . . . initially, we were told just to try to talk
               to them, but that we couldn't put undue pressure
               on them, but just try to feel them out, how they
               stood.
        Q      And you said initially.
        A      Right.
        Q      Did that change at any time?
        A      As time went on there was less concern about how
               careful you were about the way you talked to them,
               and we were assigned individual people to talk to.

(ALJ Hearing Testimony at 946.)

        Jarbo, Claudio, Stubbs, and Tyler corroborated Southgate's

testimony; each testified about encounters with Somerset Valley's

management.   Jarbo testified that a management employee named

"Jessica" followed her into the supply room.   (Id. at 692-93.)

While they were alone, Jessica asked Jarbo how she intended to

vote in the election.   (Id. at 693-94.)   Jarbo responded that she

was uncertain and, further, that she did not know if she would

attend the election.   (Id. at 693.)   Prior to this conversation,

Jessica and Jarbo had only spoken on one occasion; they never

spoke thereafter.   (Id. at 689, 695.)

        Claudio testified that Konjoh approached her, in the supply

room, approximately one week before the election.   (Id. at 108-

11.)   Konjoh entered and closed the door to the supply room, and

told Claudio that she was asking all of the employees how they

intended to vote in the election.   (Id. at 108.)   When Claudio

responded that she was uncertain how she would vote, Konjoh encouraged Claudio to vote "No".  (Id.)

Stubbs testified that she was approached by management on two separate occasions.  On the first occasion, Konjoh approached and questioned her after one of the Somerset Valley staff meetings, when she was alone.  (Id. at 867.)  Konjoh asked Stubbs how she felt about the Union, and stated both that: (1) Konjoh knew that the Union represented Stubbs at Stubbs's other place of employment; and (2) Somerset Valley did not want to unionize the workforce.  (Id.)  Stubbs did not respond.  (Id.)

On the second occasion, Geraldo, an employee from the Somerset Valley billing department, approached Stubbs while she was alone in the employee break room.  (Id. at 867-68, 882-84.)  Stubbs testified that Geraldo, like Konjoh, stated that: (1) he was aware that the Union represented Stubbs at her other place of employment; and (2) "they" did not want to unionize the Somerset Valley workforce.  (Id. at 868, 884.)  Geraldo gave Stubbs a flier and told her that the Union would charge her dues.  (Id.)

Tyler also testified that Illis twice approached her and asked questions about the Union and the upcoming election. During their first encounter, Illis approached Tyler, while she was alone in the employee break room, and asked Tyler why the employees wanted a union.  (See id. at 1019-20, 1022.)  Tyler responded, "Why not?".  (Id.)  Tyler testified that, during their

31

second encounter, Illis asked how Tyler intended to vote in the
election.  (Id. at 1022.)  When Tyler responded that she was
unsure, Illis asked Tyler to inquire of other employees how they
intended to vote and to attempt to convince them to vote against
unionization.  (Id. at 1023-24.)

## VII. The Election

The Union election took place on September 2, 2010.  (Id. at
517.)  Jacques and Napolitano served as observers for the Union,
holding signs and directing employees to voting stations.  (See
id. at 345, 2951, 3105.)

The Somerset Valley workforce voted in favor of the Union,
with thirty-eight votes for and twenty-eight votes against.  (SH
Transcript at 115; see also dkt. entry no. 35-10, GC Ex. 3.)
Five additional votes, including Wells's vote, were challenged.
(GC Ex. 3; ALJ Hearing Testimony at 1196.)  Somerset Valley
challenged Wells's vote because she was not part of the eligible
Somerset Valley workforce, i.e., the employees eligible to vote
in the election.  (ALJ Hearing Testimony at 1196; see also dkt.
entry no. 26-7, Wells Aff. at ¶ 7.)[17]

---

[17] Before the election, Somerset Valley and the Union
entered into a Stipulated Election Agreement that, inter alia,
defined the class of employees eligible to vote in the election.
(See dkt. entry no. 35-10, Stip. Election Agreement.)  Wells, as
a staffing coordinator, was not eligible.  (See id. (noting that
collective bargaining unit excluded, inter alia, "staffing
coordinators").)

## VIII.  Employee Discipline

Following the election, Konjoh and Illis began disciplining employees for a variety of infractions, including absence, tardiness, and job performance.  (See ALJ Hearing Transcript at 94-98, 122-23, 131-32, 137-38, 150, 170-74, 353, 362-68, 525, 536-37, 567, 597-99, 1178-81, 1273-76, 2011-12, 2021, 2030-35, 2145-57, 2180-84, 2190-2205, 2214-25, 2231-39, 2563-69, 2714-43, 2907-09, 2950-59.)  Somerset Valley recognizes that Illis and Konjoh did not immediately address such issues; in fact, Somerset Valley did not mete out post-election discipline until approximately six weeks after Illis joined the Somerset Valley management staff.  Somerset Valley contends, however, that such delay was caused by Illis's and Konjoh's respective needs to familiarize themselves with the Somerset Valley staff, review patient records, and, generally, settle in to their new roles.  (See id. at 2010-12, 2675-76.)  The Regional Director disagrees with this characterization of events, and argues instead that Somerset Valley was motivated by Union animus.  (See, e.g., Am. Petition.)

Napolitano, Wells, Claudio, and Jacques testified at length about the discipline that they received following the Union election.  They also testified about the discipline, or lack thereof, received by other employees.  Illis, Konjoh, and other Somerset Valley and CareOne employees also testified on these

33

matters.  The Court summarizes such testimony, with appropriate
citations to the record, in the sections that follow.

    A.   Somerset Valley's Disciplinary Policies

    Somerset Valley purportedly followed a disciplinary policy
premised upon "progressive discipline".  (ALJ Hearing Transcript
at 2579-80.)  Under a system of progressive discipline, employee
discipline begins with a "documented verbal warning" and
progresses to "written warnings", including a "final written
warning".  (Id.)  The final written warning represents the last
step before termination of employment.  (Id.)  On a case-by-case
basis, Somerset Valley might deviate from progressive discipline
based upon an employee's disciplinary history and the severity of
the offense at issue.  (Id.)

    Several employees indicated that before the Union election
Somerset Valley did not regularly discipline its employees.  The
employees uniformly testified, for example, that before the Union
election Somerset Valley did not discipline employees for
tardiness or absenteeism.  (See, e.g., id. at 347-51.)  Several
employees also testified that before the election supervisors did
not regularly check patient records for completeness or accuracy,
or issue discipline upon discovering any such errors.  (Id. at
165-67; Napolitano Dep. at 87-88.)  In lieu of discipline,
supervisors would conduct on-the-job education to prevent
similar, future errors.  (ALJ Hearing Transcript at 678, 2022-29;
dkt. entry no. 26-3, Jacques Supp. Aff. at ¶ 3.)

34

B.   <u>Discipline Received by Napolitano</u>

    1.   Pre-election Discipline for Failing to Properly
        Document a Patient's Pain Assessment

Napolitano received her first documented discipline, a written warning, from Somerset Valley in January of 2010, approximately four months before Claudio contacted the Union. (<u>See</u> Napolitano Dep. at 107-08; dkt. entry no. 35-13, GC Ex. 33.) This discipline relates to Napolitano's failure to properly document pain assessments during the September 2009 State Survey. (Napolitano Dep. at 107-08.)   Pursuant to Somerset Valley policy, Napolitano should have documented her pain assessments at the end of her shift; however, pursuant to her understanding of Somerset Valley policy and instruction received during the 2009 State Survey, Napolitano documented pain assessments for all of the her patients, and for the entirety of her 7:00 a.m. to 3:00 p.m. shift, at 8:00 a.m.   (<u>See</u> ALJ Hearing Transcript at 363, 377-79.)

    2.   Pre-election Verbal Warning for Failing to
        Properly Document TARs

Somerset Valley's records demonstrate that Napolitano may have received a verbal warning for failing to properly document administration of patient treatments in June of 2010.   (<u>See</u> dkt. entry no. 35-12, GC Ex. 30.)   Her employee file contained a Notice of Disciplinary Action, purportedly documenting a verbal warning for errors committed on June 10, 2010 and June 14, 2010. (<u>See</u> <u>id.</u>)   This Notice is not, however, signed by either

35

Napolitano or the acting DON.   (See id.; ALJ Hearing Transcript

at 346.)   Napolitano denies knowledge of the Notice and similarly

denies receiving a verbal warning for the alleged documentation

errors referenced therein.   (ALJ Hearing Transcript at 346.)

> 3.   Post-election Discipline for Tardiness

Napolitano received her first post-election discipline on

September 13, 2010.   Illis, approximately one month after joining

Somerset Valley as its administrator, ran queries in SmartLinks

to determine which employees offended Somerset Valley's policies

on tardiness and absenteeism.   (ALJ Hearing Transcript at 2713-

14.)   While reviewing the resulting report, Illis identified at

least six "repeat offenders", including Napolitano, Claudio, and

Jacques, and notified their respective supervisors.   (See id. at

111-13, 121-22, 2034-76, 2714.)   Per Illis, these supervisors

decided whether to mete out discipline.   (Id. at 2714.)

Napolitano's supervisor, Konjoh, issued a written warning to

Napolitano for tardiness.   In pertinent part, Konjoh stated in

that discipline that Napolitano "ha[d] been late 93 times since

1/1/10 and 9 times in the last 30 days[.]   This is excessive and

unacceptable.   Her attendance needs immediate improvement or may

result in termination upon the next episode of lateness."   (Id.

at 353, 2055; dkt. entry no. 35-13, GC Ex. 33.)

Napolitano admitted that she regularly began working at 7:00

a.m., approximately fifteen minutes after her shift began.

(ALJ Hearing Transcript at 352.)  She further admitted that she acted without management's explicit approval and acknowledged that her tardiness impacted patient care, inasmuch as she was unable to speak with nurses that worked with her patients during the preceding shift.  (Id.; Napolitano Dep. at 16-18, 21-23, 79-82.)  She nonetheless assumed that it was okay to come in late because she had never been reprimanded for doing so.  (Napolitano Dep. at 17-18, 79-81; see ALJ Hearing Transcript at 352.)

> 4.   Post-election Discipline for Distribution of Discontinued Medication, Improper Distribution of Medication, and Improper Documentation

Napolitano received her final discipline from Somerset Valley on September 17, 2010.  (ALJ Hearing Transcript at 94, 99, 108-09.)  This discipline stems from three issues: (1) the distribution of discontinued medication; (2) improper distribution of medication; and (3) improper documentation of a patient's pulse oximeter reading.  (Id. at 94-98.)

The first and second issues relate to Napolitano's administration of a pink zinc oxide pill to "Patient 15W".  (See id. at 89-93, 359-69, 2145-57, 2380-81, 2563-69.)  On or about September 16, 2010, Patient 15W indicated that only one nurse regularly dispensed her pink pill.  (Id. at 2146-47; dkt. entry no. 25-16, Konjoh Decl. at ¶¶ 5-6.)  Presumably, Patient 15W was not complaining about Napolitano; to the contrary, it appears that Patient 15W was frustrated that other nurses were not dispensing this pill.  (See ALJ Hearing Transcript at 2146-47.)

Konjoh, upon receipt of Patient 15W's complaint, interviewed her, reviewed her MARs, and determined that Patient 15W should not have received any pink pills. (ALJ Hearing Transcript at 2147; Konjoh Decl. at ¶ 6.) Although Patient 15W had earlier received a pink pill, zinc oxide, such medication had been discontinued in August of 2010. Konjoh nevertheless discovered that nurses charted administration of the pink zinc oxide pill four times after its discontinuation; the charts demonstrated Patient 15W had received the zinc oxide pill twice from Napolitano, on August 15, 2010 and on August 30, 2010, and twice from other nurses. (ALJ Hearing Transcript at 376.) Konjoh also discovered that instructions to administer this medication appeared on the August MAR but not on the September MAR. (Id. at 367-68, 375-76; see dkt. entry no. 35-13, GC Ex. 32.)[18]

Generally, when a doctor discontinues medication, the nurses receiving the discontinuation order should follow two steps. (See ALJ Hearing Transcript at 363-64.) First, they should note on the affected patient's MAR that the medication has been discontinued, by either highlighting the MAR entry or writing "DC" next to it. (Id.) Second, these nurses must remove the discontinued medication from the medication cart, the cart used by shift nurses to transport and dispense medications. (Id. at

---

[18] GC Ex. 32 was mislabeled as GC Ex. 33 at the ALJ Hearing. It was, however, properly introduced as GC Ex. 32. (See ALJ Hearing Transcript at 369, 374-77; GC Ex. 32.)

136, 363-64.)  Here, upon receiving the discontinuation order for
zinc oxide, nurses appropriately noted on Patient 15W's August
MAR that the zinc oxide was discontinued and, accordingly, did
not "carry it over" to the September MAR; they did not, however,
remove the zinc oxide pills from the medication cart.  (See id.
at 136, 358-59, 367-68, 375-76; see also GC Ex. 32.)

Because the zinc oxide pill had been discontinued, neither
Napolitano nor the other nurses treating Patient 15W should have
administered it.  (See ALJ Hearing Transcript at 2147; Konjoh
Decl. at ¶ 6.)  Konjoh nonetheless failed to search for the
discontinued medication on or remove the discontinued medication
from the medication cart.  (See ALJ Hearing Transcript at 89-92
(demonstrating that Napolitano, on September 17, 2010, dispensed
zinc oxide pills from the medication cart).)  She instead simply
instructed Patient 15W to refuse the pink pill if offered it
again, by any nurse.  (Id. at 366, 2147.)

Napolitano, during her September 17, 2010 shift, took the
pink pill from the medication cart and gave it to Patient 15W.
(Id. at 89-91, 359.)  Napolitano watched Patient 15W put this and
other pills in her hand and lift them to her mouth; she thus
assumed that Patient 15W actually ingested the pills.  (Id. at
89-91, 93, 360-61.)  Patient 15W did not, however, ingest the
zinc oxide pill.  (Id. at 90-91.)  Instead, she called for
Konjoh, to whom she reported the incident and handed the pill.
(Id. at 90-91, 359-61, 363, 366, 2145-57, 2563-69.)

The third issue referenced in the September 17, 2010 discipline relates to improper documentation of a patient's pulse oximeter reading.  A pulse oximeter measures oxygen concentration in a patient's bloodstream.  (See id. at 94-95, 362, 368.) During her September 17, 2010 shift, Napolitano documented a live patient's pulse oximeter reading as zero.  (Id. at 94-95, 369.) Generally, a documented pulse oximeter reading of "zero" indicates that the documentation is incorrect, the reading was incorrect, or the patient at issue is dead.  (See id. at 95.)

Konjoh and Illis met and discussed these issues with Napolitano on September 17, 2010, approximately three hours before the end of her shift.  (Id. at 94, 361-62, 367-68.) During the meeting, Napolitano signed a typed document, acknowledging that she erred by giving Patient 15W zinc oxide pills on four occasions, by failing to observe Patient 15W actually ingest the pill on September 17, 2010, and by incorrectly documenting a patient's pulse oximeter reading.  (Id. at 98, 108-09; dkt. entry no. 35-13, GC Ex. 34; Napolitano Dep. at 98.)  She also admitted that she had dispensed Patient 15W's medication from memory, rather than by reference to Patient 15W's MAR.  (ALJ Hearing Testimony at 2152.)[19]

_____

[19] Konjoh testified that, during this meeting, Napolitano admitted that she administered Patient 15W's medication from memory.  Napolitano, by contrast, testified that she had, in fact, checked the MAR before administering the zinc oxide.  (See ALJ Hearing Transcript at 89-90; Napolitano Dep. at 83.)

Napolitano, however, then contended and now contends that she would have recognized and corrected the pulse oximetry documentation error at the end of her shift, while reviewing all of her patient records.  (Id. at 95, 369.)  Napolitano regularly carried and updated a piece of paper upon which she wrote the names of her patients, their vital signs, and, sometimes, their treatments and medications: "you know, [a] piece of paper [that] has all the patients['] names on it and I put their vitals, their notes that I gave the medication or something extra like next to their name[.]"  (Id. at 165, 369.)  She further testified that she could use this paper to refresh her recollection and aid the completion or correction of her patients' charts at the end of her shift, and that such practice accorded with Somerset Valley's long-standing nursing practices.  (See id. at 369-71, 391-92.)

        5.   Napolitano's Termination

    Konjoh and Illis, at the end of their September 17, 2010 meeting with Napolitano, and only two weeks after the Union election, gave Napolitano a termination letter.  (Id. at 97; dkt. entry no. 35-13, GC Ex. 35.)  The letter states that Somerset Valley terminated Napolitano's employment for

        failure to perform essential nursing duties [and] to
        provide proper patient care, including, but not
        necessarily limited to, your failure to properly
        document the oxygen saturation level for a resident,
        your failure to properly administer medication
        to a resident, and your failure to properly verify and
        administer the correct medication to a resident,

41

> resulting [in] the administration of incorrect
> medication to a resident.

(GC Ex. 35.)  The letter also notes that Napolitano had earlier received a final written warning relating to improper patient care.  (Id.)  It did not, however, reference the September 13, 2010 discipline for tardiness.  (See id.; see also ALJ Hearing Transcript at 2741-42.)

C.   Discipline Received by Wells

Wells held  multiple roles at Somerset Valley.  (See ALJ Hearing Transcript at 1185-88.)  She began working at the facility as a CNA in 1994 and continued in that capacity until 2008, when she began serving as a part-time CNA and part-time staffing coordinator.  (Id. at 1185-86.)  In January of 2010, Wells assumed the staffing coordinator's responsibilities on a full-time basis.  (Id. at 1188; see Wells Aff. at ¶ 1.)

As the scheduling coordinator, Wells had responsibility for maintaining and updating Somerset Valley's Master Schedule; reconciling discrepancies in SmartLinks, i.e., differences between an employee's schedule, as keyed into SmartLinks, and the hours actually worked by that employees; publishing schedules and work assignments for each of the RNs, LPNs, and CNAs; submitting census reports, i.e., reports about patient occupancy, to CareOne; and ensuring adequate staff levels by filling shifts abandoned by absent or unavailable employees.  (ALJ Hearing Transcript at 1186, 1198-1202, 1204-11, 1217, 1825.)

42

### 1.   Pre-election Discipline

Somerset Valley issued documented verbal warnings to Wells on January 8, 2010 and March 4, 2010.  (Id. at 1230-32; dkt. entry no. 35-16, GC Ex. 67 (documenting January 8, 2010 discipline; dkt. entry no. 35-16, GC Ex. 68 (documenting March 4, 2010 discipline).)  Neither discipline relates to her work as a staffing coordinator; instead, they relate to her work as a CNA. Although Wells began working as a full-time staffing Coordinator in January of 2010, she continued to assume CNA responsibilities on an as-needed basis.  (See, e.g., ALJ Hearing Transcript at 1188, 1230-32, 2747-48; dkt. entry no. 35-16, GC Ex. 63 (noting that Wells "has worked on the floor as a CNA when needed").)

In fact, Wells did not receive any pre-election discipline relating to her work as staffing coordinator.  (Id. at 1232-34.) She admits, however, that she made "a few minor errors" and "mistakes" before the election, while working under Illis and Konjoh, and their predecessors.  (Id. at 1233-34, 1237.)  One of Konjoh's predecessors, Eileen Meyer, documented such errors in Wells's August 7, 2008 Performance Appraisal.  (GC Ex. 63.)

### 2.   As Scheduling Coordinator, Wells Used SmartLinks but also Maintained "Private" Records

As indicated above, the Somerset Valley staffing coordinator should key the Master Schedule into SmartLinks and then use SmartLinks -- specifically, the SmartLinks function known as the "Schedule Optimizer" -- to generate staff schedules.  (ALJ

Hearing Transcript at 1243, 1694-95, 1699-1700; see also id. at 2746 (noting that staffing coordinator "was supposed to use Schedule Optimizer within the SmartLinks program").)  Wells, however, did not use SmartLinks exclusively.  (Id. at 1223, 1253, 2093; Wells Aff. at ¶ 4.)  She also maintained a spreadsheet on her computer "with the names of all of the regular staff", i.e., all nursing staff except for newly hired employees, and "the regular schedule of each employee".  (Wells Aff. at ¶ 4; see ALJ Hearing Transcript at 1266, 2746, 2757-58.)  Wells also hand-crafted daily work assignment worksheets, listing the employees scheduled on each shift, "with scratch in or replacements listed."  (Wells Aff. at ¶ 4; ALJ Hearing Transcript at 2746.)

### 3.   Illis Regularly Spoke to Wells About Scheduling Issues Before the Union Election

Throughout August of 2010, Illis noted and spoke to Wells daily about scheduling issues.  (ALJ Hearing Transcript at 2744-45.)  Illis specifically voiced concerns "[t]hat people were either on the schedule and not coming in, or coming in and not on the schedule.  Or the employees just didn't know what shift they were.  It was just chaotic."  Id. at 2744.

Wells informed Illis that many of these issues stemmed from Heedles's proposed scheduling changes, as announced in May of 2010.  (Id. at 2745.)  Wells discovered in August of 2010 that Heedles had keyed some of those proposed changes into SmartLinks, thereby revising some but not all employees' established work

44

schedules.  (Id.; Wells Aff. at ¶ 5.)  Upon learning of Heedles's

revisions, Illis told Wells to follow the "old schedule", that

is, the Master Schedule that was in place before Heedles'

revisions.  (ALJ Hearing Transcript at 1226-27; Wells Aff. at ¶

5.)  Wells thus attempted to revise the Master Schedule, relying

on the separate spreadsheet and worksheets that she maintained on

her computer.  (ALJ Hearing Transcript at 1226.)

　　　　Despite Wells's revisions, Illis continued to note

scheduling issues.  Illis reflected on her past work experience

at other CareOne facilities that used SmartLinks and concluded

that the issues at Somerset Valley rose from Wells's use of

extraneous scheduling materials.  (Id. at 2746, 2751.)  At the

ALJ Hearing, Illis testified:

> The problems were basically caused by [Wells] using
> [an] Excel spreadsheet for her schedule as the master
> schedule and then, from there[,] she would create typed
> and handwritten daily schedules for employees.  And it
> was just -- An Excel spreadsheet wasn't the way to do
> scheduling. . . .

(Id. at 2746.)  She further stated:

> 　　The schedules being used [at] Somerset Valley were
> not accurate and that's what was causing the chaos.
> Employees didn't know when they were scheduled.  They
> didn't know when they were supposed to show up for
> work.  And you can't run a business like that.

(Id. at 2751.)  Konjoh similarly testified that:

> when I first got there [to Somerset Valley], there were
> days that we had some employees who would show up for
> work when they were not on the schedule to work.  We

had employees who would be on the schedule to work but
would not be able to punch in because the system did
not have them down to work. . . .

(Id. at 1996; see also id. at 2093.)

Illis thus instructed Wells to use SmartLinks exclusively.

(Id. at 2746.)  She also informed Wells that she "wanted

SmartLinks to match exactly what was going on, or expected to go

on" with respect to actual employee schedules at Somerset Valley.

(Id.)  She offered to train Wells or, alternatively, to provide

training contacts and resources.  (Id. at 2746-49.)

            4.   Illis Continued to Speak to Wells About Scheduling
               Issues After the Union Election

Wells exercised vacation time in early September and did not

report to work again until September 7, 2010.  (Id. at 1237.)

When she returned, Illis and Konjoh met with her to discuss

scheduling discrepancies that they discovered while Wells was on

vacation.  (Id. at 1237, 2751-52.)  Illis stressed that this was

not a disciplinary meeting.  (Id. at 2751-52.)  "The purpose of

the meeting . . . was basically to let [Wells] know that [Illis

and Konjoh] expected the things that [they] had talked about in

August to start changing and to start improving."  (Id. at 2751.)

During the meeting, Illis and Konjoh gave Wells a list of

the errors that they discovered and a plan of correction.  (Id.

at 1239-41, 2751-70; dkt. entry no. 35-16, GC Ex. 70.)  The plan

of correction included, inter alia, four instructions, directing

Wells to: (1) enter all "manually typed or hand written

46

schedules" into SmartLinks by the end of the day; (2) update SmartLinks daily, to ensure that SmartLinks reflected any actual additions or changes to the work schedule; (3) use SmartLinks, rather than hand-written or type-written spreadsheets, to create daily assignment sheets; and (4) provide Konjoh a copy of the next day's assignment sheet before leaving for the day.  (GC Ex. 70; see also ALJ Hearing Transcript at 2752-65, 2767-76.)  At the bottom of the plan of correction, Illis noted that either she or Ari Beiderman, a CareOne employee, could provide education and resources, as needed.  (GC Ex. 70; ALJ Hearing Transcript at 2761-62; see also dkt. entry no. 35-16, GC Ex. 72.)[20]

Wells signed the plan of correction but noted that it could be both difficult and time-consuming to find and reverse all of Heedles' changes in SmartLinks.  (GC Ex. 70; ALJ Hearing Transcript at 1265.)  When pressed for a timetable, Wells suggested that she could complete the changes by September 10, 2010.  (See id. at 1266.)

Wells, however, failed to complete those updates by September 10, 2010.  (Id. at 1346.)  On September 13, 2010, when Wells still had not completed the task, Konjoh and Illis assisted

---

[20] Wells may have had other resources available to her, too. John Kokorus, a CareOne employee, testified that staffing coordinators at CareOne facilities can access SmartLinks training guides and user manuals on the CareOne intranet portal.  (ALJ Hearing Transcript at 1796-97.)  He further testified that he believed but could not state with certainty that Wells enjoyed access to the portal.  (Id.)

her.  (Id. at 1346-47, 1353-54, 2109.)  After a few hours, with
Illis "inputting the staff schedule into the SmartLinks, while
[Wells] and [Konjoh] read off the schedule", they completed the
task.  (Id. at 1354.)

        5.    Post-election Discipline for Failing to Follow the
              September 7, 2010 Plan of Correction

On or about September 15, 2010, Konjoh issued Wells two
written disciplines.  The first written discipline related to
Wells's continued failure to update SmartLinks with information
about employee schedules and absences.  (Dkt. entry no. 35-16, GC
Ex. 73; ALJ Hearing Transcript at 1263-65.)  Wells signed the
discipline but noted her disagreement by writing: "Due to I been
train partially on this with many changes to staffing.  I was
train not completely was asked to do this with many changes being
done to staffing."  (GC Ex. 73 (quoted verbatim).)  Someone, in
response to Wells's note, wrote, "the above noted items are areas
Valarie has demonstrated ability to complete + this is issue of
laziness + lack of attention to detail."  (Id.)[21]

The second written discipline related to Wells's failure to
give Konjoh advance copies of the daily assignment sheets, as
required by the September 7, 2010 plan of correction.  (Dkt.
entry no. 35-16, GC Ex. 74; ALJ Hearing Transcript at 1273,

_____

     [21] The responsive note was likely written by Doreen Illis;
the initials "D.I." appear next to it.  (See GC Ex. 70; ALJ
Hearing Transcript at 1265.)

1347.)  Wells also signed this discipline and admitted her error.
(GC Ex. 74; ALJ Hearing Transcript at 1274.)  She noted, however,
that Konjoh could simply have retrieved such sheets from the
nurses' station.  (ALJ Hearing Transcript at 1274.)

Konjoh issued a third written discipline on September 20,
2010.  (Dkt. entry no. 35-16, GC Ex. 75; ALJ Hearing Transcript
at 1276.)  In this discipline, under the heading "Specific
Description of Issue", Konjoh noted that Wells "continues to have
issue[s] with scheduling staff and removing them from [the
SmartLinks scheduling platform] when cancelled or removed" and
referenced Wells' prior written disciplines.  (GC Ex. 75; ALJ
Hearing Transcript at 1276.)  On the second page, Konjoh listed
six issues relating to Wells' job performance.  (GC Ex. 75.)

Wells disagreed with the issuance of this discipline because
this discipline related, in part, to amendments to an employee's
SmartLinks schedule that Wells claimed she did not make.  (ALJ
Hearing Transcript at 1278-82).  When changes are made within
SmartLinks, SmartLinks records both the change and the system
"username" of the individual to effect that change.  (Id.)  In
this instance, SmartLinks recorded the username "dtrain".  (Id.
at 1280-82.)  Wells testified that "dtrain" was Illis's username.
(Id. at 1281-82.)  The amendments made by "dtrain", however,
relate to only one of the six issues listed on the second page of
Wells's written discipline.  (See GC Ex. 75.)

49

6.   Wells's Termination

Somerset Valley terminated Wells's employment on September 21, 2010.  (ALJ Hearing Testimony at 1289; dkt. entry no. 35-16, GC Ex. 78.)  In a related termination letter, Illis states that Wells's employment was terminated for "failure to meet expected performance standards.  As you are aware, you have been counseled as to the expectations in managing the staffing schedule, and you have been given warnings, including a final warning, but your performance has remains [sic] substandard."  (GC Ex. 78.)

D.   Discipline Received by Claudio

1.   Pre-election Verbal Warning for Failing to Properly Document a Patient's Treatment

Somerset Valley's records demonstrate that Claudio may have received a verbal warning on June 13, 2010 for failing to document a patient's treatment; her employee file contains a Notice of Disciplinary Action, purportedly documenting this warning.  (See dkt. entry no. 35-11, GC Ex. 13.)[22]  Neither Claudio nor the acting DON signed this Notice.   (See id.; ALJ Hearing Transcript at 120.)  Claudio denies knowing of the Notice and similarly denies receiving a verbal warning for the alleged documentation error.  (ALJ Hearing Transcript at 120.)

_____

[22] The Court notes that the ALJ did not receive GC Ex. 13 in evidence.  (See ALJ Hearing Transcript at 126.)  We nevertheless include a summary of the related, purported discipline in this Opinion to note the existence of such records and to provide appropriate and related citations in the record.

2.   Post-election Discipline for Tardiness and
     "Pattern Absenteeism"

Illis, as noted above, found that Claudio violated Somerset
Valley's policies regarding tardiness and absenteeism.  (ALJ
Hearing Transcript at 121-22, 2034-76, 2713-14.)  Illis thus
notified Konjoh, who issued two written disciplines to Claudio.
(Id. at 122-24, 266-67; dkt. entry no. 35-11, GC Ex. 14; dkt.
entry no. 35-11, GC Ex. 15.)  The first discipline, for "pattern
absenteeism", notes both that: (1) Claudio called out sick three
times in ninety days; and (2) two of these incidents occurred
immediately before Claudio's scheduled time off.  (GC Ex. 14.)
Claudio admits that she called out sick on these dates but denies
knowledge of any Somerset Valley policy prohibiting employees
from calling out sick on dates falling immediately before
scheduled time off.  (ALJ Hearing Transcript at 122, 266.)  The
Somerset Valley employee handbook does not contain such a policy.
(See dkt. entry no. 35-11, GC Ex. 16.)

The second discipline issued to Claudio, a second written
warning, addresses tardiness.  (ALJ Hearing Transcript at 123,
266; GC Ex. 15.)  Konjoh there noted that Claudio arrived late to
work sixty-four times between January 1, 2010 and September 12,
2010, including sixteen times between August 12, 2010 and
September 12, 2010.  (GC Ex. 15.)  Claudio does not deny that she
was tardy on those dates; she acknowledged that she arrived to
work late "a lot."  (ALJ Hearing Transcript at 266-67; see also
Claudio Dep at 22-23.)  She noted, however, that she disagreed

that this warning was a "second written warning", as her only other written discipline related to absenteeism, not tardiness. (GC Ex. 15.)

### 3.   Post-election Discipline for Improper Administration of Patient Medication

Konjoh issued Claudio a written discipline on September 17, 2010 for improperly administering medication.  (ALJ Hearing Transcript at 137-39, 261.)  A patient's MAR demonstrated that Claudio dispensed aspirin to that patient on September 8, 2010 and September 9, 2010, despite instructions on the MAR to administer aspirin only every other day.  (Id. at 138-40; see also Claudio Dep at 25, 27.)  Claudio has acknowledged her error and further acknowledges that the written instructions on the left-hand side of the MAR were clear.  (See ALJ Hearing Transcript at 142, 264; see also Claudio Dep. at 54, 99.)

Claudio, however, told Konjoh and testified at the ALJ Hearing that other nurses should share blame for her errors.  She argued that the nurse who transcribed the medication order for aspirin into the MAR should have "blocked out" the order, thus reinforcing the prescribing doctor's instructions to administer aspirin on only an every other day basis.  (Id. at 138-39, 142.)[23]

---

[23]"Blocking out" a MAR or TAR refers to a process by which nurses circle or "block out" the days when patients should receive medication or treatment.  (See SH Transcript 3 at 178-79; SH Transcript 4 at 14-15; SH Transcript 6 at 97-98; Resp. Ex. 126 at attached TAR.)

Claudio also argued that another nurse, Doreen Dande, erred by administering the same medication to the same patient on September 6, 2010 and September 7, 2010.  Based on these errors, Claudio argued that Dande should have received the same discipline, but did not.  (Id. at 138-40, 142.)

### 4.    Post-election Discipline for Repeated Documentation Errors

Konjoh met with Claudio on October 4, 2010 and issued a final written warning.  This discipline addresses four separate documentation errors.  (Id. at 149-54; dkt. entry no. 35-11, GC Ex. 19.)[24]

The first documentation error relates to patient "EW". Inasmuch as the written discipline addresses this issue, Konjoh alleges that EW fell and that Claudio failed to document EW's post-fall condition on September 20, 2010 and again on September 22, 2010.  (GC Ex. 19; ALJ Hearing Transcript at 150-52.)  When a Somerset Valley patient slips or falls, Somerset Valley policies require nurses on each shift to document the patient's condition during each of the three days that follow.  (See ALJ Hearing Transcript at 150-52.)  Claudio admitted that she should have but failed to document EW's status on both September 20, 2010 and September 22, 2010.  (Id.; dkt. entry no. 35-11, GC Ex. 20

---

[24] This discipline indicates that, following its issuance, Somerset Valley suspended Claudio for two days.  (GC Ex. 19 (indicating two day suspension, from September 29, 2011 until October 1, 2011).)

(Claudio's written response to notice of discipline); Claudio Dep. at 30, 58, 99.)

The second and third documentation errors relate to the admission of patient "RG". (GC Ex. 19; ALJ Hearing Transcript at 150-54, 205, 2196-99.) As demonstrated by the discipline, Konjoh cited Claudio for failing, in contravention of Somerset Valley policies and procedures, to: (1) draft a note about RG's condition upon admission ("the nursing note"); and (2) document RG's condition during each of the first five days following admission. (GC Ex. 19; ALJ Hearing Transcript at 150-54, 205.)

To the extent that this discipline relates to the missing nursing note, Claudio asserts that discipline was inappropriate. (Id. at 150-54; GC Ex. 20.) Claudio recognized that RG's admissions packet did not contain a nursing note but claimed that she wrote it and posited that it had been lost. (ALJ Hearing Transcript at 150-52; Claudio Dep. at 29, 57, 78-79; GC Ex. 20.) To the extent that Konjoh further cited Claudio for failing to document RG's condition post-admission, Claudio stated that: (1) she was unsure whether Konjoh's hand-written notes about this incident were originally on the discipline (i.e., GC Ex. 19); (2) Konjoh did not discuss the issue during their September 27, 2010 meeting; and (3) she could not remember working during any of the five days following RG's admission. (Claudio Dep. at 79-81; ALJ Hearing Transcript at 150-54.) Konjoh, however,

54

testified at the ALJ Hearing about the incident, and provided
documentary evidence to support the discipline.  (ALJ Hearing
Testimony at 2198-99.)

The final documentation error cited in the September 27,
2010 discipline relates to Claudio's failure to document a
doctor's treatment order.  (GC Ex. 19; see also ALJ Hearing
Transcript at 154-66, 2200-01.)  This treatment order concerned a
patient's skin tear.  (ALJ Hearing Transcript at 154-66, 2201.)
Konjoh alleges, in both the written discipline and her ALJ
Hearing testimony, that Claudio treated a patient's skin tear and
documented the treatment, but failed to document a treatment
order from the patient's doctor.  (See GC Ex. 19; ALJ Hearing
Transcript at 2200-01.)  Claudio denies that Konjoh addressed
this issue during their September 27, 2010 meeting and further
denies that it was originally included on the notice of
discipline.  She does not, however, deny that she failed to
document the order.  (See Claudio Dep. at 79-81.)

    5.   Post-election Discipline for Failing to
         Contemporaneously Complete TARs

Claudio left Somerset Valley on October 7, 2010 and drove to
"Green Knoll", an unrelated nursing facility where she worked
during the evening shift.  (ALJ Hearing Transcript at 168; dkt.
entry no. 25-3, Claudio Aff. at ¶ 2.)  While working at Green
Knoll, Claudio remembered that she failed to complete her TARs at
Somerset Valley; specifically, she failed to initial at least two

55

of her treatments, thus failing to note that such treatments were actually administered.  (See ALJ Hearing Transcript at 167-69; Claudio Dep at 100.)  When Claudio completed her shift at Green Knoll, approximately eight hours after she completed her shift at Somerset Valley, she returned to Somerset Valley to initial those treatments.  (ALJ Hearing Testimony at 169.)

When Claudio arrived at Somerset Valley, "Janet", the night shift nursing supervisor, and Illis were standing inside, near the front door of the facility.  (Id. at 169.)  Janet allowed Claudio into the facility and asked Claudio why she had returned. (Id. at 169, 251.)  Claudio responded that she "forgot something" and proceeded to the nurses' station.  (Id. at 169, 251-52.) When Janet followed Claudio to the nurses' station, Claudio clarified that she forgot to initial her TARs.  (Id. at 252.)

Janet left the nurses' station and returned shortly thereafter with Illis, who directed Claudio: (1) not to amend or otherwise alter her TARs; and (2) to leave the building.  (Id. at 169-70, 2937-38.)  Illis testified that she twice asked Claudio to stop and that Claudio ignored her; she also testified that Janet took the binder containing Claudio's TARs away from Claudio.  (Id. at 2938.)  Claudio thus left the building without signing her TARs.  (Id. at 170.)

Claudio and Napolitano later testified that, both before and after the election, Somerset Valley nurses regularly documented

56

the administration of treatments after the shift in which such treatment was actually administered.  (Id. at 170-71, 178, 372, 387-88, 391-92.)  Napolitano further testified that before the election, Somerset Valley did not discipline employees for failing to contemporaneously initial their MARs and TARs, i.e., to complete such records as medication or treatments were administered; instead, supervisors encouraged nurses to review their records at the end of the shift to ensure that all records were complete.  (Id. at 429.)

      6.   Claudio's Termination

Konjoh called Claudio on October 8, 2010 and informed her that she was suspended pending further investigation of the facts and events leading to Claudio's October 7, 2010 encounter with Janet and Illis.  (Id. at 171-72.)  Konjoh next called Claudio approximately one or two weeks later and asked Claudio to meet with her at Somerset Valley.  (Id. at 174.)  When Claudio arrived at Somerset Valley, Konjoh directed Claudio to write a statement describing the incident.  (Id. at 172.)  She also informed Claudio that the matter was still under investigation.  (Id.)

Somerset Valley terminated Claudio's employment in a letter dated October 25, 2010.  (Dkt. entry no. 25-12, GC Ex. 25.)  In that letter, Somerset Valley noted that "[t]he reason for this termination is your inappropriate and/or unprofessional conduct including but not necessarily limited to your failure to complete

required clinical documentation." (Id.)  It also noted, as

detailed above, that Claudio received a final written warning on

October 4, 2010.  (Id.)

    E.   Discipline Received by Jacques

        1.   2009 Performance Appraisal

Jacques's supervisors, Assistant DON Mel Castro and DON

Rebecca McCarthy, reviewed Jacques's job performance as part of

her March 2009 performance appraisal.  (See dkt. entry no. 59-8,

Resp. Ex. 135.)  They noted that Jacques, who had worked at

Somerset Valley for many years, performed adequately in areas

such as customer service, teamwork, and job knowledge.  (Id.)

They also noted, however, that Jacques was frequently late for

work and needed "to pay closer attention to completing admissions

assessments." (Id.; see also ALJ Hearing Transcript at 520.)

        2.   Pre-election Written Discipline for Failing to
            Assess a Newly Admitted Patient's Pain

Jacques received a final written warning on December 2, 2009

for failing to assess a newly admitted patient's pain during the

admissions process.  (Dkt. entry no. 35-8, Resp. Ex. 10; ALJ

Hearing Transcript at 597; SH Transcript at 214-15; SH Transcript

2 at 9.)  That patient suffered from rectal cancer.  (SH

Transcript 2 at 141.)  Jacques's error occurred during the 2009

State Survey.  (ALJ Hearing Transcript at 597; SH Transcript at

214-15; accord ALJ Hearing Transcript at 378, 596, 1423-35.)

NJDHSS issued a "G-level" deficiency to Somerset Valley because,

at least in part as a result of Jacques's error, Somerset Valley
failed to address the newly admitted patient's pain.  (ALJ
Hearing Transcript at 1423-35; Illis Decl. at ¶¶ 5-7; Resp. Ex.
33; <u>see also</u> Resp. Ex. 10 (noting that Jacques's error "adversely
affected the residents [sic] care" and "does not meet the
standard of care").)

Jacques acknowledges that her error was serious but contends
that her discipline was too severe because her interaction with
the patient was limited to the patient's admission to Somerset
Valley.  (<u>See</u> ALJ Hearing Transcript at 599; SH Transcript at
214-15.)  She noted, however that the nurse tasked with this
patient's daily care, Gigi Martin, also failed to assess her pain
and was subsequently terminated.  (SH Transcript 2 at 6.)

3.   Pre-election Verbal Warning for Tardiness

Jacques acknowledges that she also received a verbal warning
for tardiness in early 2010 from then-acting administrator Eileen
Meyer.  (ALJ Hearing Transcript at 519-521.)  At the time she
received this discipline, Jacques explained to Meyer that she
could not begin her shift on time because she cared for her
quadriplegic mother and, before leaving for work, had to ensure
that her mother was cared for.  (<u>Id.</u>)  Jacques testified that
Meyer instructed her to draft a letter that detailed her
extenuating circumstances, but that Meyer soon left Somerset
Valley's employ and Jacques did not submit any such letter.  (<u>Id.</u>
at 520-21.)

59

### 4.   Other Pre-election Job Performance Errors

In either July or August of 2010, Jacques left medications on the patient's bedside table and did not stay to watch the patient ingest them.  (ALJ Hearing Transcript at 479-80.)  She later testified that "there was a problem next door, so I put the pills down and I went next door and I forgot the pills.  I never went back to the pills again."  (Id. at 480.)  Jacques did not receive discipline for this infraction.  (Id. at 481; SH Transcript 2 at 10.)  Instead, Somerset Valley hosted an in-service training session on "med-pass techniques" and Jacques agreed to be more careful.  (ALJ Hearing Transcript at 480-81; SH Transcript 2 at 10-11.)

### 5.   Post-election Discipline for Tardiness and Absenteeism

As noted above, Illis, in September of 2010, found that Jacques violated Somerset Valley's policies regarding tardiness and absenteeism.  (ALJ Hearing Transcript at 525, 2034-76, 2713-14.)  Illis notified Konjoh, who, on September 14, 2010, issued two written disciplines to Jacques.  (Id. at 525, 602-03; dkt. entry no. 35-8, Resp. Ex. 9; see also SH Transcript 2 at 24.)  Through the first written discipline, Konjoh noted that "Jillian has been late 109 times since 1/1/2010.  Within the last 30 days (8/5-9/5) she was late 11 times.  This is excessive and requires immediate improvement."  (Resp. Ex. 9.)  In the area reserved for employee comments, Jacques noted that "this is an issue that was

addressed earlier in the yr [sic] by the previous DON even though nothing was in writing". (Id.)  Jacques later acknowledged, however, that 100 instances of tardiness was "a lot".  (ALJ Hearing Transcript at 601-602.)

Through the second written discipline, Konjoh cited Jacques for frequent absenteeism.  (Id. at 536-37; dkt. entry no. 35-13, GC Ex. 40.)  This discipline demonstrates that Jacques called out three times within sixty days, i.e., on July 9, 2010, August 11, 2010, and September 13, 2010, and that each occurrence followed a scheduled day off, thereby "extending her period of time off." (GC Ex. 40.)[25]  Jacques signed the discipline, but expressed that she felt that it was "unfair" and that Somerset Valley management was "waiting for her to call out [and] counting the days".  (See id.; ALJ Hearing Transcript at 537.)

> 6.  Post-election Discipline for Repeatedly Failing to Document Patient Status.

Konjoh issued a written discipline to Jacques on or about September 28, 2010.  (See dkt. entry no. 35-14, GC Ex. 43.) There, Konjoh noted that Jacques failed to document patient information: (1) on September 24, 2010, relating to the status of "Patient RG" post-admission and post-fall; (2) on September 24,

---

[25] Konjoh actually wrote, "Jillian has called out 3 times within the last 60 days. Each occurance [sic] was the day after an unschedulled [sic] day off therefore extending her period of time off."  (GC Ex. 40.)  The documents attached to the discipline show, however, that each of Jacques's "call-outs" followed a day when Jacques was not scheduled to work.

2010, relating to the status of "Patient CB" post-admission; and
(3) on September 25, 2010, again relating to the status of
Patient CB post-admission.  (GC Ex. 43.)

After reviewing the discipline, Jacques noted and informed
Konjoh that she had not worked on September 25, 2010.  (ALJ
Hearing Transcript at 554.)  After confirming that Jacques had,
in fact, not worked on September 25, 2010, Konjoh agreed to
remove the September 25, 2010 incident as a basis for the
discipline.  (Id. at 554, 644.)

7.   Post-election Discipline for Failing to Fully
     Document Incident Reports

Southgate presented Jacques a written notice of discipline
on November 1, 2010, relating to Jacques's failure to fully and
completely document two incident reports.  (ALJ Hearing
Transcript at 567; dkt. entry no. 35-14, GC Ex. 46.)  The
discipline cited several errors, i.e., "missing signatures,
unclear statements, interventions missing, missing supervisor
review[, and] CNA statement missing".  (GC Ex. 46.)

Jacques disagreed that her actions (or inaction) warranted
issuance of discipline.  (Id.; ALJ Hearing Transcript at 568-71.)
At the ALJ Hearing, she testified that Somerset Valley should
have given her twenty four hours to complete the incident
reports.  (ALJ Hearing Transcript at 571.)  She also testified
that she made reasonable attempts to locate the CNA and have her
fill out a CNA statement.  (Id. 569-70.)  She further testified

that she called Konjoh the next morning to explain the situation, but that Konjoh did not return her call.  (Id.)

Jacques did not dispute, however, that she did not complete the narrative statement about the incident.  (Id. at 638.)  This incident related to a patient's fall.  Jacques wrote:



(GC Ex. 46.)[26]

   8.   Post-election Discipline for Failing to Properly
        Transcribe a Doctor's Medication Order

Jacques received another written notice of discipline on February 9, 2011.  (ALJ Hearing Transcript at 573; see dkt. entry no. 35-14, GC Ex. 48.)  This discipline relates to two February 7, 2011 documentation errors.  First, it relates to Jacques's failure to properly transcribe a doctor's medication order, i.e., a prescription, onto the physician's order sheet.  (GC Ex. 48.)  Although the doctor's medication order called for enteric-coated aspirin, Jacques transcribed the order as calling simply for

_____

[26]   The Court finds that Jacques's statement is largely illegible.  Based, however, on the actual statement and on Jacques's decryption thereof, we believe it to state: "Called to rm 21 noted resident on the floor.  When asked what happened PT sitting on floor.  States he was trying to get into.  On observation PT sitting on the floor.  Stated I was trying to get into".  (GC Ex. 46; see also ALJ Hearing Transcript at 572-73.)

aspirin.  (ALJ Hearing Transcript at 575; GC Ex. 48.)  The discipline also relates to Jacques's total failure to transcribe the doctor's medication order onto the patient's MAR.  (GC Ex. 48.)  Jacques did not transcribe an order either for aspirin or enteric-coated aspirin onto the patient's MAR.  (ALJ Hearing Transcript at 575; GC Ex. 48.)

Jacques returned to work her next scheduled shift on February 9, 2011.  (Id. at 574.)  When she arrived, she met with Engram and Illis in Engram's office.  (Id.)  Engram and Illis spoke to her about the transcription errors, issued a written notice of discipline based upon those errors, and informed Jacques that she had been suspended.  (Id. at 574-75.)

Jacques argued that this discipline was inappropriate.  (See id. at 574-76, 623-24.)  She noted on her disciplinary form and told Engram that, on the evening of February 7, 2011, she was very busy because she was sitting as the charge nurse.  (Id. at 574-76; GC Ex. 48.)  As the charge nurse, Jacques was responsible for admitting new patients.  (ALJ Hearing Transcript at 574-76.)  That evening, Jacques admitted three patients and worked without the benefit of a functioning facsimile machine.  (Id.)

Jacques also told Engram and Illis that the discipline for the February 7, 2011 transcription errors was inappropriate because the nurses working on the next shift, the night shift, should have recognized her errors during the "24-Hour Chart

64

Check." (<u>Id.</u> at 576; <u>see also</u> SH 2 at 40-41.)  As part of the
plan of correction enacted pursuant to the 2009 State Survey,
Somerset Valley night shift nurses regularly reviewed new MAR
entries and compared them to orders transcribed on the
physician's order sheet.  (<u>See</u> ALJ Hearing Transcript at 576.)
Jacques did not explain, however, how the night shift nurses
would have known to compare the MAR, which lacked a new entry, to
the physician's order sheet.  She similarly did not explain how
the night shift nurses would, had they known to look at the
physician's order sheet, have recognized the transcription error
therein.  Engram testified at the ALJ Hearing that, while she
might have expected the night shift nurses to recognize Jacques's
transcription errors during the 24-Hour Chart Check, their doing
so "would not negate [Jacques's] failing to do it properly."
(<u>Id.</u> at 1892-93.)

     9.   Jacques's Termination

     Engram, after reviewing Jacques's disciplinary history,
terminated Jacques's employment on February 10, 2011.  (<u>Id.</u> at
576-80, 1885-89; SH Transcript at 206.)

     F.   <u>Discipline Received by Other Somerset Valley Employees</u>

     Both before and after the Union election, Somerset Valley
issued discipline to other nurses and employees that mirrored the
discipline issued to Claudio, Jacques, and Napolitano.  (<u>See,
e.g.</u>, <u>id.</u> at 2037-70; 2714-41, 2950-56.)  Some of these employees

publicly supported the Union during the organization and electioneering periods; others did not support the Union and, in some cases, did not work at Somerset Valley between May 2010 and September 2010.  (Compare id. at 2042 with id. at 3144-46.)  This section highlights some of that discipline.

      1.    Post-election Discipline for Tardiness and/or Absenteeism

Konjoh and other supervisors, acting upon Illis's SmartLinks reports, disciplined several other employees for tardiness and/or absenteeism in September of 2010.  (Id. at 2037-70; 2714-41.)  Although some of these employees publicly supported the Union, Illis denied that Somerset Valley meted out discipline based upon Union animus.  (See generally id. at 2714-41.)

At least two of the employees to receive such discipline, Kassandra Burke and Jennifer McAuley, did not publicly support the Union.  Burke received discipline for absenteeism but did not appear in the Talking Heads Piece or YouTube video, and the record does not otherwise indicate that she supported the Union.  (ALJ Hearing Transcript at 2726-31; dkt. entry no. 104-4, Resp. Ex. 104.)  McAuley, a dietary aide, received similar discipline, and similarly, the record does not indicate that she supported the Union.  (See ALJ Hearing Transcript at 2714-23; dkt. entry no. 104-4, Resp. Ex. 103; but cf. ALJ Hearing Transcript at 2723-25 and GC Ex. 10 (discipline issued to and pro-Union statements issued by Somerset Valley employee Patsy Benimadho).)

These issuances of discipline, which were meted out to
several employees in September of 2010, deterred Somerset Valley
employees from continuing set patterns of tardiness and
absenteeism.  (See id. at 2084-85, 2743.)  Jacques, for example,
improved her attendance record shortly after receiving such
discipline.  (Id. at 603-05; SH Transcript 2 at 24-25).  Illis
and Konjoh asserted that, generally, the number of instances of
tardiness and absenteeism thereafter decreased.  (ALJ Hearing
Testimony at 2084-85, 2743.)

      2.    Post-election Discipline for Improper Job
           Performance

The Regional Director argues that Somerset Valley issued
greater discipline to Union supporters than to other employees
who committed similar job performance infractions.  The Regional
Director notes, for example, that Napolitano was disciplined
because she signed Patient 15W's MAR, indicating that she
administered a discontinued medication.  (Id. at 89-91, 359-66.)
Other nurses who similarly signed the MAR, indicating that they
also administered discontinued medication, did not receive
discipline.  (Id. at 2380-81.)[27]

In other contexts, however, nurses who did not openly
support the Union received discipline for errors like those

---

[27] Konjoh testified that she did not mete out discipline to
these nurses because, unlike Napolitano, they denied actually
administering the discontinued medication to Patient 15W.  (ALJ
Hearing Transcript at 2380-81.)

committed by Claudio, Jacques, and Napolitano.  Dande, Mohamed
Bockarie, and other nurses received discipline after committing
errors relating to improper or incomplete documentation, improper
administration of medication, and improper administration of
treatment.  (See id. at 1178-81, 2174-76; 2180-84, 2240-44, 2256-
61, 2287-89, 2453-54, 2458-60, 2463-74, 2505-07, 2957-58, 3144-
46.)  Discipline for such errors varied, but generally took the
form of in-service education, documented verbal discipline, or
documented written discipline.  (Id.)

Some employees, like Bockarie, eventually faced suspension
and termination based on their repeated job performance issues.
(Id. at 3144-46.)  Somerset Valley would similarly have
terminated Dande's employment, but Dande resigned before Somerset
Valley could take such action.   (Id. at 2957-58.)

IX. **Somerset Valley Reduced its Per Diem Workforce**

A.   Somerset Valley Stopped Regularly Scheduling Per Diem
     Employees

As noted above, a per diem employee, pursuant to Somerset
Valley's policies, works on an as-needed basis.  (Id. at 956,
1405-07.)  The staffing coordinator should thus only schedule per
diem employees after scheduling all available full- and part-time
employees.  (Id. at 2885.)  However, Wells, when working as
Somerset Valley's staffing coordinator, scheduled per diem
employees in a manner that treated them as part-time employees
with regular, repeating shifts.  (Id. at 957, 1410, 2885.)

Immediately after Illis terminated Wells's employment, Konjoh assumed responsibility for setting and maintaining the Somerset Valley nursing schedule.  (See id. at 957.)  She thereafter began reducing the hours worked by per diem employees and limiting the opportunities for per diem hours at Somerset Valley.  (See id. at 711-12, 775-77, 828-30, 1153-54.)  Although many per diem employees previously enjoyed the dual benefits of regular work and increased hourly pay, Konjoh limited the opportunity for such benefits by instructing Southgate, among others, not to schedule or call per diem employees without her express prior approval.  (See id. at 957.)

Several per diem employees called Konjoh to request hours and some left messages, detailing which shifts they could work.  Konjoh did not return their calls or reinstate the hours that they previously held.  (Id. at 711-14, 722-23, 789, 1156-57.)  Konjoh, however, did not completely preclude per diem employees from working at Somerset Valley.  (See id. at 2303-05.)  For example, although she stopped scheduling Rodriguez as a regularly-scheduled per diem employee, Konjoh offered Rodriguez a full-time position on the morning shift.  (Id. at 820-21, 830, 2303-05.)  Rodriguez declined, stating that she could not regularly work during the morning shift and thus preferred to work on a per diem basis.  (Id. at 2304-05.)

69

B.   The Parties Adduced Conflicting Testimony Regarding
     Somerset Valley's Motives for Reducing Per Diem
     Employees' Hours

Southgate testified that Somerset Valley planned to contest the union election results and, further, planned to dilute Union support by reducing the hours worked by per diem employees who supported the Union.  (Id. at 958-59.)  Per Southgate, Konjoh told her that the Union might have to hold a new election, and that per diem employees who failed to work before the new Union election would not be eligible to vote.  (Id.)

Illis testified, however, that Somerset Valley was not per se eliminating its per diem workforce, but was instead replacing per diem employees with limited availability with other per diem employees who could bend around Somerset Valley's staffing needs. (Id. 2999-3000.)  "We were hiring per diems who had flexibility to work multiple days and multiple shifts.  That's what makes a good per diem.  When they have no other job, that they can come to work on the spur of the notice, that they're in constant communication[,] seeing what's going on at the center."  (Id. at 2999.)  Consequently, employees like Stubbs and Aguilar -- employees with limited availability, who could only work during specific shifts and could not work for the entirety of those shifts -- lost hours.  (See id. at 2306-07, 2910-15, 2999.)

C.    <u>Somerset Valley Effectively Terminated the Employment
      of Several Per Diem Employees</u>

Charlotte D'Antignac assumed responsibility as Somerset
Valley's staffing coordinator after working in the same capacity
at CareOne's Holmdel, New Jersey facility.  (<u>Id.</u> at 2890-91.)  As
part of the "normal function[s] of the staffing coordinator",
D'Antignac prepared a list of all employees who had not worked in
sixty days.  (<u>Id.</u> at 2890-91, 2969.)  This list included several
of the per diem employees mentioned above.  (<u>See</u> <u>id.</u>)  Illis,
upon receipt of D'Antignac's list, removed those employees from
SmartLinks and terminated their employment.  (<u>Id.</u> 2891, 2921-24;
<u>see also</u> dkt. entry no. 59-7, Resp. Exs. 122-26.)

## X.    Illis Arranges for Transfer of Nursing Employees From CareOne's Holmdel Facility

Bockarie, whose discipline and termination the Court noted
in Section VIII, above, testified at the ALJ Hearing that Illis
encouraged Bockarie to request a transfer to Somerset Valley in
an attempt to bolster support for Somerset Valley and weaken
employee support for the Union.  (ALJ Hearing Transcript at 3160-
65.)  Bockarie testified that Illis asked him to identify other
Holmdel employees who might transfer to and support Somerset
Valley in a new Union election, to report errors committed by
Somerset Valley employees, and to spy on and report Somerset
Valley co-workers who supported the Union or attended Union
functions.  (<u>Id.</u> at 3168-77.)  Illis denied Bockarie's

allegations that she asked him to transfer to Somerset Valley, to recruit other Holmdel employees to transfer to Somerset Valley, or to report Union sympathies amongst the Somerset Valley employees.  (Id. at 3262, 3273-80, 3284.)[28]

## XI.  Employee Support for the Union Waned During and Following Bouts of Employee Discipline

Walsh explained throughout both the ALJ Hearing proceedings and the Supplemental Hearing that Somerset Valley employees' support for the Union steadily decreased beginning in September of 2010.  (ALJ Hearing Transcript at 99-106; SH Transcript at 49-52, 56-75, 110-12, 171-208; see also Walsh Aff. at ¶¶ 7, 9, 11.) He testified that employees who regularly attended Union meetings, received Union literature and communication, and outwardly supported the Union ceased such behaviors after Somerset Valley began disciplining employees and, to a greater extent, after Somerset Valley terminated the employment of Napolitano and Claudio.  (ALJ Hearing Transcript at 99-106; SH Transcript at 49-52, 56-75, 110-12, 171-208.)

Walsh noted that attendance at Union meetings declined after the union election and after Somerset Valley began meting out discipline to Union supporters.  (See SH Transcript at 16-24; see also SH Ex. P-1 (sign-in sheets for Union meetings).)  During the

---

[28] The ALJ recognized the discrepancies between Bockarie's and Illis's testimony and credited Bockarie's testimony.  (ALJ Decision at 19.)

organizing campaign, approximately twenty Somerset Valley employees attended most meetings.  (SH Ex. P-1.)  After the union election, and after Somerset Valley began meting out discipline to its employees, fewer than ten employees attended most meetings, and, at one meeting, only two employees attended. (Id.; SH Transcript at 49.)  Walsh attributed the employees' decreased Union support to fear of discipline and termination. (SH Transcript at 107-08, 198-99.)

Jacques echoed Walsh's sentiments.  After Somerset Valley terminated the employment of Napolitano and Claudio, Jacques was the last Union leader working at the facility.  (Id. at 52-54, 71-73, 204.)  At the Supplemental Hearing, she testified, "My coworkers fired, written up, I was written up, and I was fearful of being terminated as well."  (Id. at 204.)

Jacques spoke to Walsh about the ongoing issues at Somerset Valley during December of 2010 and January of 2011 and learned that the Union certification process was still not complete because Somerset Valley challenged the results of the Union election.  (See id. at 183-84.)  She testified, "I sort of felt like they weren't there to protect us.  I mean, they weren't coming in, and so no one was there to protect us."  (Id. at 198.)

Napolitano, Claudio, and Jacques continued to support the Union.  (See id. at 12-14, 207-08, 210-11; SH 2 at 43-60.) Napolitano and Claudio, following their respective terminations,

performed work for and were paid by the Union.  (SH Transcript at 12-14.)  They also continued to attend Union meetings with active Somerset Valley employees.  (Id. at 207-08.)  Jacques, following her termination from Somerset Valley's employ, continued to answer Somerset Valley employees' questions about the Union and to refer employees to Walsh.  (Id. at 210-11.)  She also attended Union demonstrations, either actively protesting or observing protests staged at events attended by CareOne's owners.  (SH Transcript 2 at 43-60.)

## XII.  The ALJ Found that Somerset Valley Violated Section 8(a)(1) and Section 8(a)(3) of the National Labor Relations Act

The Regional Director, pursuant to Section 10(b) of the Act, 29 U.S.C. § 160(b) ("Section 10(b)"), filed an administrative complaint, alleging that Somerset Valley committed unfair labor practices, including, inter alia: (1) interrogating employees about Union membership; (2) soliciting employee grievances and promising employees improved terms and conditions of employment if they refrained from Union activity; (3) discharging Napolitano, Wells, Claudio, and Jacques; and (4) reducing the hours worked by per diem employees Stubbs, Rodriguez, Aguilar, Joseph, and Onyeike.  (See ALJ Decision at 1-2.)

Following nineteen non-consecutive days of testimony that spread across three months, the ALJ Hearing concluded on June 28, 2011.  (See ALJ Hearing Transcript at 3241, 3324.)  The ALJ thereafter issued a lengthy decision on the Regional Director's

74

unfair labor practice charges.  (See generally ALJ Decision.)  He found that Somerset Valley violated Section 8(a)(1) by: (1) interrogating Claudio, Jarbo, Stubbs, and Tyler about their Union sympathies and votes in the Union election; and (2) soliciting employee grievances and complaints, and promising increased benefits, terms of employment, and conditions of employment. (Id. at 39-42.)  He also found that Somerset Valley violated Section 8(a)(3) by: (1) disciplining and terminating the employment of Claudio; (2) disciplining and terminating the employment of Jacques; (3) disciplining and terminating the employment of Napolitano; (4) disciplining and terminating the employment of Wells; and (5) reducing the hours worked by Stubbs, Rodriguez, Aguilar, Joseph, and Onyeike.  (Id. at 42-50.)[29]

## XIII.  The Supplemental Hearing

The parties appeared before this Court for the Supplemental Hearing on eight non-consecutive days between November 30, 2011 and February 9, 2012.  Each party re-called fact witnesses who testified before the ALJ; Jacques, Walsh, and Kokorus testified again.  To the extent that their testimony aids the Court's disposition of this matter, it has been cited above.

---

[29] The ALJ also found that Somerset Valley violated Section 8(a)(3) by accelerating the resignation date offered by Lynette Tyler, who announced on September 9, 2010 that she would leave Somerset Valley's employ on September 22, 2010.  (ALJ Decision at 49-50.)  Because the Regional Director has not requested relief related to Tyler in the Amended Petition, the Court notes but does not further discuss the ALJ's findings related to Tyler.

Each party also called expert witnesses; Somerset Valley called Beth Bell and William Isele, and the Regional Director called Kathleen Martin.  In the subsections that follow, the Court notes each expert's qualifications and areas of expertise, and summarizes their opinions.

A.   <u>The Expert Witnesses</u>

Somerset Valley called Bell during its case-in-chief.  Bell graduated as a registered nurse ("RN") in or about 1978 and has since worked as, <u>inter</u> <u>alia</u>, an RN in acute care facilities, a field investigator for the New Jersey Office of the Ombudsman for the Institutionalized Elderly ("Office of the Ombudsman"), and as a complaints investigator for NJDHSS.  (SH Ex. D-6, <u>Curriculum Vitae</u> of Beth Bell ("Bell CV"); <u>see also</u> SH 2 at 101-02.)  Bell currently consults in long-term care and assisted living facilities.  (Bell CV; SH Transcript 2 at 101.)  The Court qualified Bell as an expert witness in four areas: (1) the State Survey process; (2) the regulations relating to the State Survey process; (3) standards of nursing home administration; and (4) standards of nursing care applicable in long-term care facilities in New Jersey.  (SH 2 at 106-11.)

Somerset Valley also called Isele, who testified during both the case-in-chief and sur-rebuttal.  Isele, an attorney, served as General Counsel to the Office of the Ombudsman from June of 1998 until October of 1999 and thereafter served as the Ombudsman

until October of 2007.  (SH Transcript 2 at 5-7.)  As Ombudsman,
Isele served as the administrator and chief executive of the
Office of the Ombudsman, and protected the public interest by
assuming responsibility for the office's three major functions:

> First of all, to receive, investigate, and resolve
> complaints of abuse, neglect, and exploitation of
> people 60 years of age and older who reside in
> long-term care facilities;
> Secondly, to secure, preserve, promote the health,
> safety, and welfare and the civil and human rights of
> those individuals 60 years of age and older. . . .
> And then thirdly, the Office was charged with
> promoting, advocating, and insuring the adequacy of
> care received and the quality of life experienced by
> elderly residents of long-term care facilities in the
> State.

(Id. at 6-8.)  Isele currently works for the law firm Archer and
Greiner, P.C., where he specializes in healthcare and elder law.
(Id. at 4.)  Based on the sum of his experiences, the Court
qualified Isele as an expert in nursing home administration.
(Id. at 13.)

The final expert witness, Kathleen Martin, was called by the
Regional Director, during rebuttal.  Martin earned her
associate's degree in nursing from Bergen Community College in
1977 and her bachelor's degree in nursing from Pace University in
1979.  (SH Ex. P-30, Curriculum Vitae of Kathleen Martin ("Martin
CV") at 6; SH Transcript 6 at 5.)  She thereafter earned masters
degrees in nursing and public administration from Seton Hall
University in 1982 and 1996, respectively.  (Martin CV at 5-6; SH

Transcript 6 at 5.)  In the public administration program, Martin studied the manner in which "facilities, mainly hospitals, operate" and took courses in "healthcare administration . . . and areas with healthcare operations." (SH Transcript 6 at 7.)

Martin served as the administrator at several facilities, including two CareOne facilities located in New Jersey. (Martin CV at 2-3; SH Transcript 6 at 29-38.)  She worked as the Assistant Vice President of Quality, Case & Risk Management for Bayonne Medical Center from September of 2008 until November of 2009, and, in that role, oversaw the Bayonne Medical Center's intra-hospital long-term care unit. (SH Transcript at 18-19, 22.)  Finally, she also worked as the Chief Clinical Executive of Hospicomm Management, a company that manages six long-term care facilities located in New Jersey, from December of 2009 until September of 2011. (Id. at 15, 18.)  Based on the sum of her experiences, the Court qualified Martin as an expert in three areas: (1) the administration of long-term care facilities; (2) nursing practices; and (3) State Surveys. (Id. at 52.)

> B.  Expert Testimony Regarding the Potential Effects of Reinstating Napolitano, Claudio, Jacques, and Wells, and Reinstating and Restoring Hours Worked by Per Diem Employees

Each expert testified at length about the effects on the public interest that would be caused by reinstating Napolitano, Claudio, and Jacques to their respective former positions at Somerset Valley.  Bell and Isele also testified about the effects

78

on the public interest that would be caused by (1) reinstating Wells; and (2) requiring Somerset Valley to reinstate and restore the hours worked by a group of per diem nurses.

       1.   Napolitano

Each expert testified about Napolitano's job performance and disciplinary history, and the effect of her potential reinstatement on the public interest.

              a.   The 1-4-10 Discipline for Documenting all Pain Assessments for Her Shift at 8:00 a.m.

Bell and Martin agreed that Napolitano violated accepted standards of nursing care when, at 8:00 a.m., she documented pain assessments for all of her patients and for the entirety of her shift, which did not end until 3:15 p.m.  (SH Transcript 2 at 117; SH Transcript 7 at 73-74.)  Isele similarly testified that nurses should, instead of documenting pain assessments only at the beginning of a shift, perform and contemporaneously document pain assessments "early and often throughout a shift."  (SH Transcript 3 at 25.)

Bell, Isele, and Martin, assuming that Napolitano completed pain assessments for all of her patients and for the entirety of her shift at 8:00 a.m., agreed that Napolitano risked patient harm because she created the potential for unaddressed pain.  (SH Transcript 2 at 117; SH Transcript 3 at 26-27; SH Transcript 7 at 71-73.)  Isele further testified that patients could suffer either because: (1) they suffered from unaddressed pain; or,

conversely, (2) Napolitano's early pain assessment led to the administration of strong analgesic medication that the patients did not require.  (SH Transcript 3 at 26.)  He noted, for example, that some narcotics could cause constipation and bowel rupture, which in turn would cause death.  (Id. at 27.)

Isele also noted, however, that Napolitano may not have completed pain assessments for all of her patients; based on the documentary evidence, he opined that Napolitano likely documented pain assessments that she had not actually performed.  (Id. at 25-26.)  Napolitano arrived for her January 4, 2010 shift at 7:04 a.m. and completed pain assessments for between sixteen and twenty patients at 8:00 a.m.  (See id.; SH Transcript 8 at 7-8.)  Isele noted that it was possible but "highly unlikely" that she could perform and document so many pain assessments in such a short period of time, and thus inferred that Napolitano engaged in a "dangerous [and] fraudulent practice" by falsifying medical records.  (SH Transcript 3 at 25, 27; SH Transcript 8 at 7-8.)

Martin acknowledged that performance and documentation of pain assessments was a "basic" task taught to all nursing students.  (SH Transcript 6 at 64.)  She also acknowledged, as noted above, that Napolitano's error in this instance violated applicable standards of nursing care and created the potential for patient harm.  (SH Transcript 7 at 71-74.)  She nonetheless opined that Napolitano should not have received written

discipline for this incident.  (SH Transcript 6 at 61-63.)
Martin noted that Napolitano, based on instructions received
during the 2009 State Survey, misunderstood the proper procedure
for performing and documenting pain assessments.  (Id. at 61; see
also ALJ Hearing Transcript at 363, 377-79.)  Because Napolitano
did not fully understand the proper procedures relating to pain
assessments, Martin testified that either a verbal warning or
in-service education (or both) would have been more appropriate
than a written discipline.  (SH Transcript 6 at 61-63.)

> b. The June 2010 Unsigned Record of Verbal
> Warning for Failing to Initial Treatments

When reviewing Napolitano's disciplinary record, Martin
disregarded this unsigned discipline.  (Id. at 67 ("If it's not
signed by anybody, I didn't pay attention to it."); SH Transcript
7 at 75.)  Because it was not signed either by Napolitano or by a
Somerset Valley representative, she assumed that Napolitano had
not received it.  (SH Transcript 6 at 69.)  She acknowledged,
however, that a failure to initial treatment records was a
violation of the applicable standards of nursing care that would
warrant discipline.  (SH Transcript 7 at 75-76.)

Bell and Isele testified that a nurse's failure to document
administration of treatments or medications can impact patient
safety.  (SH Transcript 2 at 118-121; SH Transcript 3 at 28, 32.)
With respect to undocumented treatments, Bell noted that "if
they're not documented, they're not done."  (SH Transcript 2 at

81

121, 159.)  She explained that a nurse's failure to document could result in "the next shift coming on" lacking knowledge of "whether or not the resident received the care that was prescribed by the physician."  (Id. at 121.)  Isele similarly noted that a failure to document administration of treatments or medications could result in repeated and unnecessary administrations.  (SH Transcript 3 at 28.)

Isele also testified that nurses may easily avoid such harm, simply by initialing patient TARs or MARs when administering related treatments or medications.  (Id.)  "All [a nurse] has to do is initial a box [indicating] that she administered the treatment that was prescribed.  There is no reason in the world that this cannot be done contemporaneously."  (Id.)

                    c.    The 9-17-10 Discipline, inasmuch as it
                          Relates to Administering Discontinued
                          Medication

Bell and Martin agreed that Napolitano violated applicable standards of nursing care by repeatedly administering a discontinued medication, i.e., zinc oxide, to Patient 15W.  (See SH Transcript 2 at 122, 155-56; SH Transcript 7 at 76.)  Bell noted that Napolitano, "in effect, [administered] medication without a physician's order" and thus could have caused harm to the patient.  (SH Transcript at 122-23.)  Isele agreed, noting that "[i]t's a significant error to give somebody a medication that has been discontinued."  (SH Transcript 3 at 35.)

Martin, however, testified that Napolitano should not have received a written discipline for these errors, based on two mitigating factors.  First, Martin testified that Konjoh's investigative tactics, following receipt of Patient 15W's complaints, contributed to Napolitano's errors.  (SH Transcript 6 at 71-73, 83-84.)  Martin specifically faulted Konjoh for failing to prevent Napolitano's administration of zinc oxide to Patient 15W on September 17, 2010.  (Id.)  She acknowledged, however, that Konjoh did not learn that Patient 15W had received a "pink pill" from any nurse until or shortly before September 17, 2010; she thus acknowledged that, inasmuch as Konjoh might have prevented Napolitano's erroneous administration of medication, Konjoh could only have prevented the September 17, 2010 incident.  (SH Transcript 7 at 78-79; see also SH Transcript 2 at 192-97, 200-05; SH Transcript 8 at 7-9, 11.)

Martin also initially testified that, by failing to remove the discontinued zinc oxide from the medication cart, other nurses contributed to Napolitano's medication administration error.  (SH Transcript 6 at 74-81.)  She acknowledged on cross-examination, however, that other nurses' failures did not excuse or negate Napolitano's mistakes because Napolitano, in determining which medications to administer, should have relied on the MAR.  (See, e.g., SH Transcript 7 at 86.)  Martin stated:

> If it's -- if the med's there [i.e., on the medication
> cart] and she read [the MAR] closely, she'd know to

take it out or to verify and maybe check the order and
did it -- was it, in fact, discontinued . . . maybe
you'd want to go check that."

(Id. at 82.)  Martin thus acknowledged that Napolitano would not
have administered discontinued medication to Patient 15W, on any
occasion, if she had read Patient 15W's MAR before administering
her medications.  (See id. at 82, 211-13.)

> d.   The 9-17-10 Discipline, inasmuch as it
>      Relates to Leaving Patient Medication at the
>      Patient's Bedside

Bell testified that a nurse would violate accepted standards
of nursing care by leaving pills unattended on a patient's
bedside table.  (SH Transcript 2 at 115.)  Both Bell and Isele
testified that such actions constitute bad nursing practices
because: (1) the nurse cannot ensure that the patient will take
the medication; and (2) other patients could take and ingest the
unattended medications.  (SH Transcript 2 at 123; SH Transcript 3
at 41.)

Martin testified that Napolitano did not, in fact, leave
medication on Patient 15W's bedside table.  Thus, Napolitano did
not receive discipline for leaving medication unattended; she
received discipline because she did not observe Patient 15W
actually ingest the pink zinc oxide pill, as demonstrated by
Patient 15W's ability to later hand that pill to Konjoh.  (SH
Transcript 6 at 85-86.  But see ALJ Hearing Testimony at 89-91,
93, 360-61 (demonstrating that Napolitano watched Patient 15W put

this and other pills in her hand and lift her hand to her
mouth).)

After learning that Napolitano did not, in fact, actually
leave Patient 15W's pills on her bedside table, Isele commented
this he could "drop this one out" without affecting his analysis
of the sum of Napolitano's nursing errors or the impact on the
public interest of reinstating her employment.  (SH Transcript 3
at 41-42, 148.)

> e.   The 9-17-10 Discipline, inasmuch as it
> Relates to Documenting a Patient's Oximeter
> Reading as Zero

Isele described Napolitano's oximeter reading documentation
as "an obvious error", assuming that the patient at issue was
alive; Martin indicated that it was a "clear error".  (SH
Transcript 3 at 43; SH Transcript 6 at 88.)  Martin explained
that "zero is just not accurate.  It would be 100 or 90 if you
wanted a zero there, but an actual zero would not be accurate."

Isele and Bell agreed that Napolitano's error, despite its
obviousness, could lead to actual patient harm.  (SH Transcript 2
at 123-24, 159; SH Transcript 3 at 43-44, 149; SH Transcript 8 at
21-22.)  Isele explained that patients with pulse oximetry levels
below ninety typically go to the hospital for immediate
treatment.  (SH Transcript 3 at 43-44.)  He further explained
that Napolitano's error, in this instance, would have barred
other medical personnel from knowing the patient's true pulse

oximetry and, thus, would have barred them from determining whether the patient required immediate hospitalization. (Id.)

Martin, however, testified that Somerset Valley erred by issuing this discipline to Napolitano at noon, more than three hours before the end of her shift. (SH Transcript 6 at 88-92.) Martin noted that, in her professional experience in long-term care facilities, nurses often took notes on loose papers and/or paper towels and compared those notes to their patients' charts at the end of a shift. (Id. at 89-92.) Martin thus would not have issued discipline to Napolitano, because Napolitano: (1) testified that she wrote patients' vital signs on a separate sheet of paper; (2) could possibly have noticed and corrected the oximeter reading error by comparing these notes to the relevant TAR at the end of her shift; and (3) received discipline before the end of her shift, thus depriving of her of the opportunity to possibly correct the error. (SH Transcript 6 at 86, 89-91.)

Bell and Isele each criticized Napolitano's practice and, in so doing, Martin's acceptance of the practice of documenting patient information on materials other than TARs, MARs, and official patient records. (SH Transcript 3 at 49-51; SH Transcript 4 at 7-8, 10; SH Transcript 8 at 20.) Bell described it as standing "against every standard of nursing practice that I know." (SH Transcript 4 at 7-8.) Isele noted that writing information on loose papers increased the likelihood of error in

86

transcribing pertinent information onto patients' charts.  (SH Transcript 3 at 49-50.)

> f.   Effect on the Public Interest of Reinstatement Napolitano's Employment

After consideration of Napolitano's errors and disciplines, Bell opined that her reinstatement would not serve the public interest because Napolitano committed several mistakes that were "indicative of sloppy nursing care".  (SH Transcript 2 at 74, 125.)  She further stated that Napolitano would place patients "at risk because [she] had sloppy habits, and the potential is there for more significant errors than what has already occurred."  (Id. at 126.)

Isele similarly testified that, with respect to Napolitano, he observed "a pattern of disregard or indifference to the importance of contemporaneous documentation."  (SH Transcript 3 at 17-18; see also SH Transcript 8 at 23 (referring to Napolitano as "a nurse who clearly does not understand or appreciate the importance of contemporaneous documentation").)  He further stated that "this is not something that education is going to help.  This is a character flaw."  (SH Transcript 3 at 51.) Isele thus opined that reinstating Napolitano's employment would not serve the public interest because "[she is] a danger to the vulnerable elderly people that [she] would serve in this facility".  (Id. 3 at 17, 24, 106; see also SH Transcript 8 at 24

(referring to Napolitano as "a danger to the health, safety, and welfare of patients that she treats").)

Martin did not consider Napolitano to be a risk to her patients or the public. (SH Transcript 6 at 96.) Martin testified that she lacked "evidence that she was a danger or a bad nurse in any way." (Id.; see also SH Transcript 7 at 94.)

### 2.   Wells

Bell and Isele both examined and testified about Wells's job performance at Somerset Valley. They agreed that her employment as a staffing coordinator and, specifically, her use of privately maintained spreadsheets that supplemented and circumvented the SmartLinks scheduling system stymied proper staffing at Somerset Valley. (SH Transcript 2 at 126-27, 132-33; SH Transcript 3 at 99-102.) They accordingly concluded that reinstating Wells would negatively impact the public interest. (SH Transcript 2 at 129, 135, 179; SH Transcript 3 at 98-99, 102, 107-08.)

Bell noted that Somerset Valley repeatedly instructed Wells to use SmartLinks, and that Wells failed to do so. (SH Transcript 2 at 126.) She also noted discrepancies between the SmartLinks Master Schedule and, based on instances of tardiness and absenteeism, actual staff schedules. (See id. at 126-27.) She concluded that Wells put residents at risk by creating a situation where employees did not understand their schedules and staffing levels were not met. (Id. at 129, 135.)

88

Isele testified that "[i]n the years [he] served as the ombudsman, [he] developed the firm belief that staffing issues were probably the single most frequent cause of abuse and neglect in long-term care facilities." (SH Transcript 3 at 99.) He also stated that "[u]nderstaffing leads to underservice." (Id. at 99.) Because, in his view, Wells's actions as staffing coordinator prevented Somerset Valley from ensuring that it properly and adequately staffed its facility, Isele concluded that reinstating Wells would negatively affect both patient care and the public interest. (See id. at 18-19, 97-102, 107-08.)

Martin did not testify about the discipline meted out to Wells or express an opinion regarding her reinstatement.

### 3. Claudio

Each expert testified about Claudio's job performance and disciplinary history, and the effect that reinstating Claudio's employment would have on the public interest.

#### a. 9-17-10 Discipline for Incorrectly Administering Patient Medication

Bell and Martin agreed that Claudio violated accepted standards of nursing care by administering aspirin to a patient in a manner that was inconsistent with the patient's doctor's prescription, i.e., by administering aspirin every day when the doctor prescribed it only every other day. (SH Transcript 2 at 136, 159-60, 163; SH Transcript 7 at 97-98.) Isele similarly testified that, as a matter of good practice, nurses should

follow "the letter" of a doctor's medication order.  (SH
Transcript 3 at 52, 54-55.)

Martin testified that, as a long-term care facility
administrator, she would not have issued a final written warning
to Claudio for this error; she would, instead, only have issued a
verbal warning.  (SH Transcript 6 at 108.)  Martin felt that a
final written warning was too harsh a discipline in this instance
for two reasons, i.e., because: (1) the dates on the right-hand
side of the MAR were not "blocked out"; and (2) the 24-Hour Chart
Check did not recognize and report Claudio's error.  (Id. at 97-
99, 101-03, 105-06, 109.)

Taken together, the testimony of Bell and Isele demonstrated
that any lack of "blocking out" did not mitigate Claudio's
discipline.  Bell, for example, doubted that Claudio read or
referenced the patient's MAR before administering medication; if
Claudio had not read or referenced the MAR, a lack of "blocking
out" would be irrelevant.  (See SH Transcript 2 at 137 ("I would
question whether or not she had the MAR even with her at the time
she administered this medication . . ."); SH Transcript 4 at 15-
16.)  She nonetheless stated that "that blocking off system is
what some facilities do as a crutch" and noted that a lack of
"blocking off" "doesn't negate what the physician ordered."  (SH
Transcript 4 at 21.)  Isele similarly testified, stating that
Claudio, if she had read the instructions printed on the left-

hand side of the patient's MAR, would not have committed the medication administration error.  (SH Transcript 8 at 25-26; <u>see also</u> SH Transcript 7 at 98.)

Neither Bell nor Isele directly addressed Martin's contention that the failure of the 24-Hour Cart Check to notice or alert others to Claudio's medication administration error somehow mitigated or excused Claudio's error.  Isele did, however, explain in other contexts that the failure of the 24-Hour Chart Check to discover a nurse's error did not excuse that error.  (<u>See, e.g.</u>, SH Transcript 7 at 211-13; SH Transcript 8 at 48.)

> b.   10-4-10 Discipline, Relating to Four
>      Documentation Errors

Through the October 4, 2010 discipline, Somerset Valley addressed four documentation errors, <u>i.e.</u>, Claudio's failure to document: (1) on patient EW post fall; (2) a narrative nursing note during the admission of patient RG; (3) on patient RG post fall; and (4) a doctor's order for treatment of a patient's skin tear.

With respect to each of the documentation errors included in this discipline, Martin discussed the circumstances surrounding each error and discussed possible mitigating factors that, as an administrator, she might have considered.  (<u>See</u> SH Transcript 112-30.)  She then testified, however, that these incidents, taken together, still warranted some form of discipline.  Because

she disagreed with the issuance of Claudio's September 17, 2010
discipline, she disagreed with the end result of this discipline,
i.e., a final written warning and a two-day suspension.  (SH
Transcript 6 at 137-38.)  She nevertheless did not disagree with
issuing some form of written discipline and subjecting Claudio to
at least a short suspension. (Id.)  She stated:

> it's not so much that I have a problem with the step,
> or whatever they want to do, it's where they came from
> to begin with, if you know what I mean. Like it's not
> -- if it's a final written already, the first one, you
> know, and now you're going to a suspension -- a two-day
> suspension, which is pretty severe. So, I mean --
> you're -- if you're asking me what I would do, I would
> have made it a second warning. I could have made it a
> one-day suspension. You know, I just -- that's kind of
> -- almost doesn't matter what I think I might do with
> it. But it's just -- it's based on the fact that the
> [September 17, 2010 discipline] is the first one that
> I'm looking at that she has a problem.

(Id.)

Martin and Bell agreed that each of the four documentation
errors constituted a separate violation of acceptable standards
of nursing care.  (SH Transcript 2 at 137-38; SH Transcript 7 at
99-100.)

> c.   Claudio's Late-Night Return to Somerset
>      Valley on 10-7-10, to Initial her patients'
>      TARs

All three expert witnesses agreed that Claudio should have
signed her patients' TARs either during or immediately after
administering their treatments.  (SH Transcript 7 at 113-14; SH
Transcript 8 at 40-41; see SH Transcript 2 at 138-139.)  Bell and

92

Martin agreed that each failure to initial a TAR, _i.e._, each and
every instance wherein Claudio should have but failed to place
her initials in a patient's TAR, constitutes a separate error.
(SH Transcript 2 at 139; SH Transcript 7 at 113-14.)

Martin, however, testified that she recognized Claudio's
failure to initial her patients' TARs as a "common failure".  (SH
Transcript 6 at 142-43.)  She also testified that Claudio's
actions, in returning to Somerset Valley eight hours after the
end of her shift to complete her patients' TARs, were "okay" and
"positive".  (_Id._ at 141-24.)  Accordingly, Martin would not have
stopped Claudio from completing those TARs; instead, she would
have complimented Claudio and simply addressed the issue, _i.e._,
the initial failure to document patients' treatments, at a later
date.  (_Id._ at 140-142.)

Isele strongly disagreed.  He noted that "[b]lank TARS are
the exception, not the rule."  (SH Transcript 8 at 43.)  He
opined that the discipline meted out by Somerset Valley was
appropriate based upon Claudio's initial failure to complete
patients' TARs.  (_See_ SH Transcript 7 at 70-75.)  He stated:

> I can think of no reason why a person would not
> [contemporaneously initial patient TARs] unless . . .
> she was walking around without the treatment book,
> without the book with the TARs in it.  In which case,
> she's only guessing at which treatments each individual
> resident requires, and that's even worse practice.

(_Id._ at 75.)

93

Bell and Isele acknowledged that Claudio returned to the facility that evening, between eight and sixteen hours after completing her patients' treatments, to document such treatments. They opined, however, that her return to the facility did not negate her initial error.  Isele noted that Claudio, who worked during the 7:00 a.m. to 3:00 p.m. shift, returned at 11:00 p.m to complete her patients' TARs.  Because she did not return until 11:00 p.m., the nurses working on the 3:00 p.m. to 11:00 p.m. shift worked without the benefit of her documentation.  (SH Transcript 3 at 73-75.)

Martin commented that nurses working on the next shift, i.e., on the 3:00 p.m. to 11:00 p.m. shift, had no reason to "look back" to review Claudio's notes.  (SH Transcript 6 at 142-43.)  Isele disagreed, noting that such nurses would not know whether Claudio administered patient treatments.  (SH Transcript 3 at 73-74; SH Transcript 8 at 41-42.)  As noted above, Isele earlier testified that the failure to document administration of treatments or medications could result in repeated and unnecessary administrations.  (SH Transcript 3 at 28.)

d.   Effect on the Public Interest of
Reinstatement Claudio's Employment

Isele testified that reinstating Claudio's employment would not serve the public interest because Claudio demonstrated a pattern of disregard for the importance of contemporaneous documentation.  (Id. at 17-18, 77-78.)  He also opined that,

94

based upon the same pattern of behavior, education and/or
training were unlikely to curb future issues.  (Id. at 106.)

Bell similarly testified that reinstating Claudio would not
serve the public interest.  (SH Transcript 2 at 140, 173).  She
found that Claudio "demonstrated really sloppy nursing practice
with potential for significant error."  (Id. at 140.)  She also
testified that Claudio could endanger Somerset Valley's
residents.  (SH Transcript 2 at 163-64.)  Bell stated that
Claudio:

> is the individual who attempted to document all of her
> treatments at the end of her shift, and was instructed
> by her supervisor to stop, and she continued, and was
> insubordinate to the supervisor. And I really feel
> strongly about this, that someone with a personality
> that volatile could place a resident as a staff -- if I
> were in nursing administration in that facility, I
> would be watching this staff member very closely
> because I would identify her as a possible potential
> risk of abuse to the residents, and that's one of the
> regulations at 226. That you identify either staff or
> residents who create the potential for abuse. So, I
> would question that in this particular individual.

(Id.)

Martin, however, testified that Claudio should not have been
terminated and that her reinstatement would not create any risk
for the public.  (See SH Transcript 6 at 145.)  Although she
recognized that "certainly the[re] were, you know, issues that
need to be addressed and corrected", she did not "believe that
[Claudio] had a very long track record of clinical problems that
would . . . need to be addressed and corrected."  (Id. at 146.)

4.   Jacques

Each expert testified about Jacques's job performance and disciplinary history, and the effect that reinstating her employment would have on the public interest.

a.   12-2-09 Discipline for Failing to Assess a Newly Admitted Patient's Pain

Bell noted that Jacques's failure to perform a pain assessment in December of 2009 related to feedback that she received earlier that year, in her 2009 Somerset Valley employee performance appraisal.  (SH Transcript 5 at 138-42.)  In that appraisal, dated March 25, 2009, the acting Somerset Valley DON noted that Jacques "need[ed] to pay closer attention to completing admissions assessments."  (Resp. Ex. 135 at second page).

Isele testified at length regarding Jacques's failure to assess the pain of a newly admitted rectal cancer patient.  This patient had a lesion in her rectum and suffered from what Isele described as "excruciating pain" each time she had a bowel movement.  (SH Transcript 3 at 78-79, 81.)  He stated:

> [T]his was a very alert and oriented resident, this was not a demented person.  She knew what was going on.  She was quite articulate in how she described her situation to the surveyor.  And she told the surveyor that every time she had a bowel movement, the pain was so severe that she had to scream out, and she was embarrassed that other people in the nursing home would hear her screams.  So she took a washcloth and stuffed it in her mouth to muffle her own screams, that's how bad the pain was that this woman was

96

suffering on the 20th of November when she spoke to the
State surveyor.

* * *

The pain, the excruciating pain that this woman
experienced every day from November 4th to November
24th, so severe that she had to stick a rag in her own
mouth to muffle her screams because she was concerned
about disturbing the other nursing home residents is --
constitutes some of the most severe harm that I have
seen, including everything that I saw and reviewed
during the course of my term as the State ombudsman,
the nine and a quarter years that I spent there as
general counsel and as ombudsman.

It is just incredible to me that this was allowed
to go on for 21 days.  And it was Ms. Jacques' failure
to address pain in her initial assessment of this
resident, failure to complete a pain assessment, that
set a series of failures in motion.  The inter
disciplinary team had no indication on the initial
nursing assessment the pain was an issue.  So, they
. . . didn't make a care plan to treat this woman's
pain.  The doctor apparently prescribed an ointment --
Lidocaine to -- like the Novocaine that you get when
you go to the dentist, short-acting.  The purpose of
the ointment was to dull the pain of that lesion in her
rectum so that she could go to the bathroom. Lidocaine
is a short-acting anesthetic, it doesn't last long, but
it lasts long enough to have a bowel movement.  It is
never documented in those 20 days that she was there
before she spoke with the surveyor that she got that
Lidocaine ointment so she could go to the bathroom
without pain.

(Id. at 79, 81-82.)  Isele also noted that, although the

patient's doctor prescribed an analgesic ointment, the patient

did not receive treatment for pain.  (Id. at 82-83.)  Isele

attributed the lack of treatment, at least in part, to Jacques's

initial failure to assess the patient's pain.  (Id. at 83.)

Ms. Jacques did not complete a pain assessment, as she
should have, and she admits that.  And that formed the
basis for the lack of treatment that this woman
received for the next 20 days of her life.  Before --
fortunately, the State happened to come in.  I don't
know how long this would have gone on if the State
hadn't come in, probably until she died.

(Id. at 83; see also SH Transcript 8 at 45-46.)

Martin testified that the interdisciplinary team, instead of
Jacques, should receive full blame for failing to craft a
meaningful care plan for this patient's pain.  (SH Transcript 6
at 152-55.)  She acknowledged Jacques's failure to assess the
patient's pain upon admission but testified that the
interdisciplinary team should also have gathered information
about the patient's pain levels from other sources.  (Id.)  She
also acknowledged, however, that Jacques's error in failing to
assess the patient's pain was a violation of the applicable
standard of nursing care and a "significant mistake".  (See SH
Transcript 7 at 18, 39.)

> b.   9-24-10 Discipline for Various Failures to
>      Document Patient Statuses

Bell and Martin agreed that Jacques's several documentation
errors each constituted a separate violation of the applicable
standards of nursing care.  (SH Transcript 2 at 143, 150; SH
Transcript 7 at 18, 43.)  Martin, in fact, approved of the
discipline meted out by Somerset Valley for these errors.  (SH
Transcript 6 at 160.)

98

Bell testified that each violation of the standard of care
created the potential for patient harm.  (See SH Transcript 2 at
150.)  With respect to Jacques's failure to document the status
of newly admitted patients, she testified that such failure
results in administration of improper care to those patients.
(Id.)

        c.   11-1-10 Discipline for Failure to Complete
            Incident Reports

Martin argued that Jacques's failure to complete incident
reports did not violate any standard of nursing care.  (See SH 7
at 17-18, 45-46, 61-62.)  She also testified that, as an
administrator, she would not have disciplined Jacques for failing
to complete the incident reports at issue.  (SH Transcript 6 at
168.)  She acknowledged, however, that Jacques narrative's
statements were "incomplete" and "inappropriate".  (SH Transcript
7 at 51-53, 61-62.)

Isele described Jacques's narrative statements as "[n]ot
adequate in any way".  (SH Transcript 3 at 90.)  He explained:

> it is not, in any way, an acceptable explanation of
> what she did, how she proceeded, what intervention she
> took, or if she didn't take any interventions, why she
> felt no interventions were necessary, did she get the
> patient back into bed, did she call someone else to
> help her get the patient back into bed?  We don't know
> any of that.

(SH Transcript 3 at 90.)  He further explained, as did Bell, that
without such information, nurses working on subsequent shifts

would be unable to adequately treat the patient or prevent
similar incidents from occurring.  (Id. at 88-90; SH Transcript 2
at 143.)

> d.    2-9-11 Discipline for Medication
>        Transcription Errors

Martin, Bell, and Isele noted that Jacques committed two
errors, in that she: (1) transcribed "ASA", i.e., aspirin, onto
the Physician's Order Sheet instead of "EC ASA", i.e., enteric
coated aspirin; and (2) failed to transcribe aspirin, in any
form, on the patient's MAR.  (SH Transcript 2 at 140-41, 165; SH
Transcript 3 at 91-93; SH Transcript 6 at 172-75.)  Martin
testified that, as an administrator, these errors warranted some
form of discipline but not termination.  (SH Transcript 6 at
172.)  Martin testified that termination was inappropriate, in
part, because the 24-Hour Chart Check should have discovered and
reported Jacques's transcription errors.  (Id.)

Isele disagreed, noting that "[i]t's not ok to make medical
errors regardless of the fact that there are so-called fail safe
measures in effect."  (SH Transcript 3 at 94-95.)  Isele
testified that, although the 24-Hour Chart Check should have
discovered and although an outside pharmacist actually discovered
Jacques's errors, Jacques still bore ultimate responsibility for
her mistakes.  (See id.)

100

e.   Effect on the Public Interest of
Reinstatement Jacques's Employment

Isele testified that reinstating Jacques's employment would

be "absolutely contrary to the public interest" because

> to use a colloquialism, "she just doesn't get it."  She
> does not understand the importance of documentation.
> She does not understand her responsibilities in at
> least two cases documented here as an admission nurse.
> And those responsibilities have [e]ffects down the line
> as long as that person is in the nursing home.  She
> just doesn't understand that.  "It's routine, it's an
> annoyance, it's the only time I had that person so I
> can't possibly be responsible for her" was the attitude
> I got from her testimony in court yesterday.[30]
> I would like to believe that further education
> might change that, but having heard Ms. Jacques'
> testimony yesterday, I don't believe that even further
> education would make her less of a danger than she is.

(SH Transcript 3 at 95-96.)  Bell generally agreed that

reinstating Jacques's employment would not serve the public

interest.  (SH Transcript 2 at 174.)

Martin disagreed.  (See SH Transcript 6 at 173-74.)  Upon

her review of Jacques's disciplinary history, she concluded both

that Jacques's disciplinary history did not warrant termination

and that Jacques was not a danger to her patients or the public.

(See id.; SH Transcript 7 at 55-69.)

5.   The Per Diem Employees

Bell and Isele both testified that Somerset Valley, by

reducing or eliminating the schedules of per diem employees,

---

[30] Isele was referring to Jacques's December 1, 2011
Supplemental Hearing testimony, which he observed.

improved patient care.  (See SH Transcript 2 at 151-52; SH Transcript 3 at 102-104.)  Both testified that elderly patients benefit from "continuity of care", i.e., from familiarity with nurses and care providers who consistently and regularly work at their long-term facility.  (SH Transcript 2 at 152; SH Transcript 3 at 103-04.)  Isele testified that facilities that rely primarily on full-time and part-time employees, and that minimize the use of per diem employees, enjoy better relationships and communication with their patients.  (SH Transcript 3 at 103-04.)  Accordingly, both Bell and Isele testified that restoring the hours of affected Somerset Valley per diem employees would not serve the public interest.  (SH Transcript 2 at 152; SH Transcript 3 at 104.)

Martin did not express an opinion regarding the restoration of per diem employees' hours.

## CONCLUSIONS OF LAW

### I.  Standard of Review

The Regional Director now presents the Amended Petition pursuant to Section 10(j) of the Act, 29 U.S.C. § 160(j) ("Section 10(j)").  Section 10(j) permits the Regional Director, after filing an administrative complaint pursuant to Section 10(b), to petition a United States district court "for appropriate temporary relief or restraining order".  29 U.S.C. § 160(j).

102

While resolving the Amended Petition, this Court must consider two elements.  First, the Court must determine whether the Regional Director has "reasonable cause" to believe that Somerset Valley committed unfair labor practices and thus violated the Act.  "To establish reasonable cause in the Third Circuit, 'there must be a substantial, non-frivolous legal theory, implicit or explicit, in the Regional Director's argument, and second, taking the facts favorably to the Regional Director, there must be sufficient evidence to support that theory.'"  Chester v. Grane Healthcare Co., 666 F.3d 87, 98 (3d Cir. 2011) (citing Pascarell ex rel. N.L.R.B. v. Vibra Screw, Inc., 904 F.2d 874, 882 (3d Cir. 1990)).  When considering whether the Regional Director had "reasonable cause" to file a Section 10(b) complaint, we are mindful that these proceedings "are subordinate to the unfair labor practice proceedings . . . heard before the Board" and, consequently, "it is not the job of the district court, in considering a § 10(j) petition, to adjudicate the merits of the unfair labor practice case."  Ahearn v. Jackson Hosp. Corp., 351 F.3d 226, 237 (6th Cir. 2003) (citation and internal quotation marks omitted).

Second, the Court must determine whether the relief sought by the Regional Director is "just and proper".  See 29 U.S.C. § 160(j); Chester, 666 F.3d at 98.  When determining whether the

relief sought by the Regional Director is "just and proper", the Court must determine "whether an injunction is necessary to preserve the Regional Director's remedial powers, which incorporates a weighing of relative harms to the bargaining process, employees' rights, and the likelihood of restoring the status quo absent injunctive relief, along with the public interests implicated by the labor disputes." <u>Chester</u>, 666 F.3d at 99. Such "just and proper" analysis thus subsumes the three equitable prongs examined in traditional injunctive relief proceedings, <u>i.e.</u>, that: (1) the petitioner will likely suffer irreparable harm in the absence of injunctive relief; (2) the balance of equities tips in the petitioner's favor; and (3) an injunction serves the public interest. <u>See</u> <u>id.</u>

**II. Analysis**

    A.   <u>Reasonable Cause Analysis</u>

       1.   Section 8(a)(1)

The Regional Director alleges that Somerset Valley violated Section 8(a)(1) of the Act by coercively interrogating employees, and by soliciting grievances and promising improved terms and conditions of employment. Section 8(a)(1) provides that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1).

104

a.   Interrogating Employees

An employer's interrogation of its employees is unlawful under the Act if, in light of the totality of the circumstances, such interrogation reasonably tends to interfere with, restrain, or coerce employees in their exercise of rights guaranteed by the Act.  Eisenberg v. Tubari, Ltd., No. 85-1857, 1985 WL 32832, at *12 (D.N.J. July 8, 1985); Sunrise Senior Living, Inc., 344 NLRB 1246, 1254 (2005).  To determine whether an interrogation is coercive, the Court must examine the totality of the circumstances; "[r]elevant factors include whether proper assurances were given concerning the questioning, the background and timing of the interrogation, the nature of the information sought, the identity of the questioner, and the place and method of the interrogation."  Sunrise Senior Living, 344 NLRB at 1254.

At the conclusion of the underlying unfair labor practices proceeding, the ALJ concluded that Somerset Valley unlawfully interrogated employees in a manner that "tended to coerce employees in the exercise of their" rights under the Act.  (See ALJ Decision at 39-41.)  Based upon the findings of fact recited in Section VI(C)(4) of this Memorandum Opinion, the Court similarly finds that the Regional Director had reasonable cause to believe that Somerset Valley committed such acts.  The record, as shown by the testimony of Southgate, Jarbo, Claudio, Stubbs, and Tyler, demonstrates that Somerset Valley, in the weeks

105

leading up to the September 2010 union election, actively polled employees about their Union sympathies and activity and, in at least one instance, asked an employee to try and convince her co-workers to vote against the Union during the September 2010 union election. (ALJ Hearing Transcript at 108-11, 692-95, 867-68, 882-84, 946, 1019-24.)  Most of these conversations took place when employees were separated from their co-workers, either because they sat alone in the employee break room or because they had walked into medical and/or supply closets.  (Id.)

Because the Regional Director expressed a substantial and non-frivolous legal theory, and because his theory finds support in the record, we conclude that the Regional Director had reasonable cause to believe that Somerset Valley violated Section 8(a)(1) by interrogating its employees.

   b. Soliciting Grievances and Promising Benefits

"The Regional Director has long held that, in the absence of a previous practice of doing so, the solicitation of grievances by an employer during an organizational campaign violates the Act when the employer promises to remedy those grievances." Ctr. Constr. Co., 345 NLRB 729, 730 (2005); see also Moore-Duncan ex rel. N.L.R.B. v. Aldworth Co., Inc., 124 F.Supp.2d 268, 281-82 (D.N.J. 2000).  "The solicitation of grievances alone is not unlawful, but it raises an inference that the employer is promising to remedy the grievances.  This inference is

particularly compelling when, during a union organizational campaign, an employer that has not previously had a practice of soliciting employee grievances institutes such a practice." Ctr. Constr. Co., 345 NLRB at 730.

At the conclusion of the underlying unfair labor practices proceeding, the ALJ concluded that Somerset Valley unlawfully solicited grievances from employees and impliedly promised to better their employment terms and conditions. (See ALJ Decision at 41-42.) Based upon the findings of fact recited in Section VI(C)(1) of this Memorandum Opinion, the Court similarly finds that the Regional Director had reasonable cause to believe that Somerset Valley committed such acts. Multiple employees reported that Lee encouraged employees to speak to management about perceived, necessary workplace changes. (ALJ Hearing Transcript at 1013-14.) Further, Hutchens asked employees to give Somerset Valley's management an opportunity to resolve employee issues and "turn things around". (Id. at 105, 515, 1021.) Hutchens also told employees to contact him directly to discuss workplace issues and distributed his cellular telephone number. (Id. at 106-07.) Nothing in the record demonstrates that Lee, Hutchens, or other management personnel previously took similar actions.

Hutchens and Illis also acted upon employee complaints. In one instance, for example, after learning that the employees lacked access to the bags needed to collect dirty linens,

Hutchens directed Illis to distribute and Illis actually distributed linen bags to the employees during the next morning shift.  (Id. at 865, 1472-73.)

Because the Regional Director expressed more than one substantial and non-frivolous legal theory, and because his theories find support in the record, the Court concludes that the Regional Director had reasonable cause to believe that Somerset Valley violated Section 8(a)(1) by soliciting employee grievances and either implicitly or explicitly promising to remedy those grievances.

2.   Section 8(a)(3)

The Regional Director finally alleges that Somerset Valley violated Section 8(a)(3) by disciplining and terminating the employment of Napolitano, Wells, Claudio, and Jacques, and also by reducing the hours previously held and worked by per diem employees Stubbs, Rodriguez, Aguilar, Joseph, and Onyeike. Section 8(a)(3) provides that it is an unlawful labor practice for an employer to discharge or otherwise discriminate against employees in retaliation for their union activity. 29 U.S.C. § 158(a)(3); Aldworth Co., 128 F.Supp.2d at 283.

To determine whether an employer has violated Section 8(a)(3), the Court applies a burden-shifting standard.  Champion Parts Rebuilders, Inc. v. N.L.R.B., 717 F.2d 845, 849 n.6 (3d Cir. 1983); see St. John's Cmty. Servs.--N.J., Case No. 22-CA-

26934, 2010 WL 3177582, at *19 (NLRB Aug. 10, 2010).  The
Regional Director must, in the first instance, make out a prima
facie case of discrimination premised upon union support or
activity.  Aldworth Co., 128 F.Supp.2d at 283.  "Among the
factors to be considered in determining whether an employee has
stated a prima facie case of discrimination are (1) the
employee's union activity, (2) the employer's knowledge of the
employee's union activity, and (3) the employer's hostility to
the union activity."  Id. (citations omitted).  The Court may
infer both the employer's knowledge of its employees' union
activity and any related discriminatory motive from
circumstantial evidence.  Id.

When, in the context of "reasonable cause" analysis, the
Court determines whether the Regional Director met his initial
burden, the Court does "not question the legitimacy of the
Respondent's need to enforce its" patient care policies.  See St.
John's Cmty. Servs., 2010 WL 3177582, at *19.

> The absolute importance that the Respondent attaches to
> its policy is not at issue.  Similarly, the gravity of
> the harm to the [patient] because of such an error is
> also not at issue.  The issue here concerns how the
> Respondent dealt with its employees who committed []
> errors. . . .

Id.  Further, a finding that the employees' discipline and/or
discharges violated the act

> [d]oes not alter or undermine an employer's authority
> to implement or enforce work rules.  Nor does it cast

> doubt on an employer's ability to <u>more strictly enforce</u> its work rules. . . .  An employer's more stringent enforcement of its work rules will not constitute a violation of the Act unless it is a consequence of employee participation in protected activity.

<u>In re Schrock Cabinet Co.</u>, 339 NLRB 182, 183-84 (2003) (emphasis in original).

Once the Regional Director meets his burden, the Court must find that the employer violated Section 8(a)(3) unless the employer rebuts the Regional Director's showing by demonstrating that it would have disciplined or discharged the affected employees "in any event because of unprotected conduct." <u>Champion Parts Rebuilders</u>, 717 F.2d at 849 n.6.

> a.  The Regional Director Had Reasonable Cause to Believe that Somerset Valley Violated Section 8(a)(3) by Disciplining and Discharging Napolitano, Wells, and Claudio

At the conclusion of the unfair labor practices proceeding, the ALJ concluded, <u>inter alia</u>, that Somerset Valley unlawfully disciplined and discharged Napolitano, Wells, and Claudio.  (ALJ Decision at 43-47, 48-49.)  Based upon the findings of fact recited in Sections IV(C)-(E), VI(B)(1)-(3), VI(C)(3), VII, VIII(A)-(C), VIII(F), and XIII(B)(1)-(3) of this Memorandum Opinion, the Court similarly finds that the Regional Director had reasonable cause to believe that Somerset Valley unlawfully disciplined and discharged those employees.  The Regional Director met his burden by demonstrating that: (1) Napolitano,

110

Wells, and Claudio participated in protected Union activity;
(2) Somerset Valley knew of such activity; and (3) Somerset
Valley disciplined and discharged Napolitano and Wells because of
such activity.  See Aldworth Co., 128 F.Supp.2d at 283.

First, the Regional Director demonstrated that Napolitano,
Wells, and Claudio openly participated in protected Union
activity by supporting and campaigning on behalf of the Union.
Napolitano and Claudio served as Union organizers and spoke
about, distributed literature for, and otherwise openly
campaigned for and supported the Union.  (ALJ Hearing Transcript
at 44-45, 51-54, 73-74, 293-95, 304-06, 312, 316, 486, 501,
821-22, 926-27, 1189-90.)  During the Union organization process,
Napolitano and Claudio regularly spoke to and updated Southgate
on the Union's progress.  (Id. at 273, 279-80, 331-32.)
Furthermore, Napolitano, Wells, and Claudio appeared in Union
literature and marketing materials, such as the Talking Heads
Piece and the YouTube Video.  (GC Ex. 10 (featuring Napolitano
and Wells); GC Ex. 11 (featuring Claudio and Wells).)

Second, the Regional Director demonstrated that Somerset
Valley knew that these employees supported and acted on behalf
of the Union.  After receiving notice of the petition for a
union, Somerset Valley managers, including Southgate and Illis,
met and attempted to identify Union supporters.  (ALJ Hearing
Transcript at 945-52.)  During these meetings, managers reviewed

Union materials, such as the Talking Heads Piece, that featured, among others, Napolitano Wells, and Claudio.  (Id. at 945-52, 3099-101.)

Finally, the Regional Director made a prima facie showing of violations of Section 8(a)(3) by demonstrating that Somerset Valley disciplined and thereafter discharged Napolitano, Wells, and Claudio based on Union animus.  Such showing finds support in the timing of the disciplines and discharges meted out to each of these three employees.

Before the September 2, 2010 election, Napolitano, Wells, and Claudio received minimal discipline; Napolitano received a January 2010 warning, Wells received two disciplines relating to her former CNA responsibilities, and Claudio did not receive any pre-election discipline.  (Id. at 36-37, 44-45.)[31]  After the election, however, Somerset Valley quickly and repeatedly disciplined Napolitano, Wells, and Claudio for behavior that it had previously tolerated.  (See id. at 37-42, 50-51, 52-59.) Napolitano and Claudio, for example, received discipline for time and attendance issues dating back to January 1, 2010; all three employees received discipline for performance issues that were not discussed or remedied before the election.  (Id.)

---

[31] Although Somerset Valley produced unsigned notices of verbal warnings, purportedly issued to Napolitano and Claudio in June of 2010, Napolitano and Claudio denied receiving and Somerset Valley failed to otherwise demonstrate that it issued such discipline.  (See GC Ex. 34; GC Ex. 35.)

Somerset Valley also quickly discharged each of these employees.  It terminated Napolitano's employment within two weeks of the election, terminated Wells's employment within three weeks of the election, and suspended Claudio approximately four weeks after the election.  (Id. at 43, 51, 59.)  Somerset Valley thereafter terminated Claudio's employment.  (Id. at 59.)

Somerset Valley contends that it issued performance-related discipline to and discharged Napolitano, Wells, and Claudio in accordance with set policies and procedures.  With respect to the this discipline, however, Somerset Valley failed to produce evidence demonstrating that it issued discipline to similarly situated employees during the weeks immediately following the Union election.  (See, e.g., id. at 138-40, 142, 2380-81 (demonstrating that nurses who either improperly administered medication or improperly documented administration of medication were not disciplined for such errors).)  As such, Somerset Valley failed to overcome the Regional Director's prima facie showing.[32]

Based on the foregoing, the Court thus concludes that the Regional Director expressed substantial and non-frivolous legal theories demonstrating that Somerset Valley violated Section

---

[32] Somerset Valley did, however, produce evidence demonstrating that it disciplined several employees for tardiness and absenteeism, including employees who did not openly support the Union.  Accordingly, we conclude that Somerset Valley overcame the Regional Director's prima facie showing with respect to the time and attendance disciplines meted out to Napolitano and Claudio.

113

8(a)(3).  Because the Regional Director's theories find support in the record, the Court concludes that the Regional Director had reasonable cause to believe that Somerset Valley violated Section 8(a)(3) by issuing several performance-related disciplines to and thereafter discharging Napolitano, Wells, and Claudio.

> b.    The Regional Director Lacked Reasonable Cause to Believe that Somerset Valley Violated Section 8(a)(3) by Disciplining and Discharging Jacques

At the conclusion of the unfair labor practices hearing, the ALJ also concluded that Somerset Valley unlawfully disciplined and discharged Jacques.  (ALJ Decision at 47-48.)  Upon review of the record, and relying upon the findings of fact detailed in Sections IV(C)-(E), VI(B)(1)-(3), VI(C)(3), VII, VIII(A), VIII(D), VIII(F), and XIII(B)(4) of this Memorandum Opinion, however, the Court concludes that: (1) the Regional Director made a prima facie showing that Somerset Valley violated Section 8(a)(3) by disciplining and discharging Jacques; but (2) Somerset Valley overcame the Regional Director's prima facie showing.[33]

The Regional Director demonstrated that Jacques, like Napolitano, openly participated in protected Union activity by

---

[33] The Court notes that the ALJ's decision in the underlying unfair labor practices hearing is persuasive but not binding authority.  <u>See, e.g.</u>, <u>Chester</u>, 666 F.3d at 91.  This Court may thus reach a different conclusion in its "reasonable cause" analysis than the ALJ reached on the merits of the unfair labor practices proceeding.

openly supporting and campaigning on behalf of the Union.  (ALJ
Hearing Transcript at 44-45, 51-54, 73-74, 293-95, 304-06, 312,
316, 486, 501, 821-22, 927-27, 1189-90.)  Jacques served as a
Union organizer and spoke about, distributed literature for, and
otherwise openly campaigned for and supported the Union.  (Id.)
Furthermore, like Napolitano, Wells, and Claudio, Jacques
appeared in Union literature and marketing materials, such as the
Talking Heads Piece and the YouTube video, which was filmed at
Jacques's home.  (GC Ex. 10; GC Ex. 11; ALJ Hearing Transcript at
505-509; SH Transcript at 31-32.)

    The Regional Director further demonstrated that Somerset
Valley knew that Jacques supported and acted on behalf of the
Union.  Managers, working to identify Union supporters, reviewed
the Talking Heads Piece and YouTube video; they thus knew of
Jacques's Union support.  (ALJ Hearing Transcript at 945-52,
3099-101.)  Further, Jacques identified herself as a Union
supporter by working as an observer for the Union at the
September 2, 2010 union election.  (See id. at 345, 2951, 3105.)

    Finally, the Regional Director made a prima facie showing
that Somerset Valley violated Section 8(a)(3) by demonstrating
through circumstantial evidence that Somerset Valley disciplined
and thereafter discharged Jacques based on Union animus.  Before
the union election, Jacques, who worked at Somerset Valley for

115

over eleven years, received few disciplines.[34]  (Id. at 60-61.)
After the election, between September of 2010 until February of
2011, she received several disciplines relating to her job
performance.  (Id. at 62-67.)

We have determined based on the record, however, that
Somerset Valley nevertheless would have disciplined and
discharged Jacques "in any event because of unprotected conduct."
See Champion Parts Rebuilders, 717 F.2d at 849 n.6.  Our
determination rests on two conclusions.

First, we note that the timing of Jacques's discipline and
discharge, relative to the Union election, differs from that
received by Napolitano, Wells, and Claudio.  In the preceding
section of this Memorandum Opinion, we noted that the timing of
the disciplines issued to and discharge of Napolitano, Wells, and
Claudio supported the Regional Director's prima facie showing
that Somerset Valley violated Section 8(a)(3); such timing gave
rise to an inference of unlawful discrimination premised on Union
animus.  By contrast, the timing of the discipline meted out to
and discharge of Jacques does not support the same inference.

---

[34] The Court acknowledges that Jacques received a "final
written warning" in January of 2010 for failing to assess a
patient's pain upon admission.  The Court notes, however, that
such discipline was not treated as a final written warning
because the next discipline issued after the "final written
warning" did not result in Jacques's termination.  (See ALJ
Hearing Transcript at 2579-80.)

116

Jacques, unlike the other employees at issue, did not immediately receive several performance-related disciplines and termination following the union election.  Instead, she received such discipline over a six-month period.  (See id. (demonstrating that Jacques received performance-related discipline twice in September of 2010, once in November of 2010, and once in February of 2011).)  Such disciplines resulted in the eventual termination of her employment.  (See id. at 67.)  As such, the mere fact that Jacques received greater discipline after the election than she had before does not support the conclusion that Somerset Valley violated Section 8(a)(3).

Second, we find that Somerset Valley disciplined and discharged Jacques in accordance with set practices and procedures, as demonstrated by the similar discipline meted out to and discharge of similarly situated nursing employees who did not support the Union.  Somerset Valley took steps to discharge several employees with long disciplinary histories, including Jacques, Dande, and Bockarie.  (Id. at 2957-58, 3144-46.)[35]  The record demonstrates that Dande appeared in some of the Union literature but, otherwise, did not openly participate in or support the Union; Bockarie, by comparison, joined Somerset Valley after the September 2, 2010 election and demonstrated no

---

[35] Somerset Valley did not actually discharge Dande because she resigned before Somerset Valley could terminate her employment.

support for or affiliation with the Union.  (See GC Ex. 10; ALJ
Hearing Transcript at 3160-65.)  Accordingly, we have concluded
that Somerset Valley would have terminated Jacques's employment
even in the absence of her protected Union activity.

        c.    The Regional Director Had Reasonable Cause to
             Believe that Somerset Valley Violated Section
             8(a)(3) by Reducing the Hours Worked by
             Certain Per Diem Employees

At the conclusion of the unfair labor practices hearing, the
ALJ concluded that Somerset Valley unlawfully reduced the hours
formerly held and worked by Somerset Valley per diem employees
Stubbs, Rodriguez, Aguilar, Joseph, and Onyeike.  (ALJ Decision
at 50.)  Upon review of the record, and relying upon the findings
of fact detailed in Sections IX and X of this Memorandum Opinion,
the Court concludes that the Regional Director made a prima facie
showing that Somerset Valley violated Section 8(a)(3) by reducing
the hours formerly held and worked by Stubbs, Rodriguez, Aguilar,
Joseph, and Onyeike.

As detailed above, Somerset Valley per diem employees,
including but not limited to Stubbs, Rodriguez, Aguilar, Joseph,
and Onyeike, regularly worked set schedules before the September
2, 2010 union election.  Wells scheduled such employees as though
they part-time employees instead of "as-needed" or "fill-in"
personnel.  (Id. at 957, 1410, 2885.)  After the election,
however, Somerset Valley stripped Stubbs, Rodriguez, Aguilar,
Joseph, and Onyeike -- per diem employees who openly supported

118

the Union -- of all hours; none of these employees thereafter
worked either on a regular, scheduled basis or on an as-needed
basis.  The record contains evidence demonstrating that Somerset
Valley intentionally stopped scheduling these employees in order
to dilute the Somerset Valley workforce's support for the Union.
(Id. at 958-59.)

Based on the foregoing, the Court accordingly concludes the
Regional Director expressed a substantial and non-frivolous legal
theory tending to show that Somerset Valley violated Section
8(a)(3) by reducing the hours held and worked by the above-
mentioned per diem employees.  Because the Regional Director's
theory finds support in the record, the Court concludes that the
Regional Director had reasonable cause to believe that Somerset
Valley so violated Section 8(a)(3).

B.   Just & Proper Analysis

The Regional Director has requested several forms of
injunctive relief, including, inter alia, reinstatement of
Napolitano, Wells, Claudio, and Jacques, and restoration of the
hours formerly worked by per diem employees Stubbs, Rodriguez,
Aguilar, Joseph, and Onyeike.  (Am. Petition at 4-7.)  The Court
now examines each requested remedy to determine whether ordering
those remedies would be "just and proper".

1.   Remedies Relating to Napolitano and Claudio

The Regional Director asks the Court to reinstate Napolitano
and Claudio based on the public interest in safeguarding the

119

collective bargaining process.  He has also asked the Court to rescind and remove discipline from their respective employee files.  We note that by terminating Napolitano and Claudio, vocal Union supporters who openly solicited union representation and otherwise supported and campaigned on behalf of the Union, Somerset Valley thwarted the objectives and goals of the Act. See Aldworth, 124 F.Supp.2d at 293-94.  Indeed, "[g]ranting reinstatement of discharged employees under 10(j) relief [may] also [be] just and proper.  Reinstatement will demonstrate that the reprisals against pro-union employees were unlawful and will send the message that anti-union discrimination will not be tolerated."  Id. at 294.  "Furthermore, reinstatement will allow unlawfully terminated employees to again become part of the bargaining process.  We find that the discharge of those active and open union supporters undoubtedly had an adverse impact upon employee interest in unionization, and" the Court recognizes that public interest served by "swiftly and surely" countering this impact.  See id.

The public interest in safeguarding the collective bargaining process would be even more greatly served by reinstating Napolitano and Claudio because they were not merely Union supporters; they were Union leaders.  Napolitano and Claudio were two of the three channels for information from the Union.  Without their presence at Somerset Valley, the Union

120

lacks effective distribution channels for information about
meetings and issues affecting the Somerset Valley workforce.
(See ALJ Hearing Transcript at 99-106; SH Transcript at 14-15,
49-52, 56-75, 110-12, 171-208.)

The public interest in protecting the bargaining process is,
however, only one of the interests that this Court must consider.
Because "just and proper" analysis subsumes the three equitable
prongs examined in traditional injunctive relief proceedings, as
detailed above, the Court must also examine the effect that such
relief will have on Somerset Valley's interests, specifically, on
Somerset Valley's ongoing ability to provide adequate care for
its patients.  See Chester, 666 F.3d at 99-100; see also N.L.R.B.
v. Health Care & Retirement Corp. of Am., 511 U.S. 571, 577
(1994) ("Patient care is the business of a nursing home, and it
follows that attending to the needs of the nursing home patients,
who are the employer's customers, is in the interest of the
employer.").[36]

---

[36] The Court is mindful, too, that nursing homes "are not
factories or mines or assembly plants."  N.L.R.B. v. Baptist
Hosp., Inc., 442 U.S. 773, 783 n.12 (1979).  Instead, they are
facilities "where human ailments are treated, where patients and
relatives alike often are under emotional strain and worry, where
pleasing and comforting patients are principal facets of the
day's activity, and where the patient and his family-irrespective
of whether that patient and that family are labor or management
oriented-need a restful, uncluttered, relaxing, and helpful
atmosphere, rather than one remindful of the tensions of the
marketplace in addition to the tensions of the sick bed."  Id.

The Court agrees with Somerset Valley's expert witnesses, Bell and Isele, inasmuch as each testified that Napolitano and Claudio set forth a record of "sloppy nursing care", including documentation errors and medication administration errors.  (See SH Transcript 2 at 74, 125, 140; SH Transcript 3 at 17-18, 51, 77-78, 106; SH Transcript 8 at 23.)  The Court further agrees, as first noted by Bell, that Claudio may pose a risk to Somerset Valley's residents.  (See SH Transcript 2 at 164.)  Claudio has demonstrated repeatedly demonstrated contempt and disregard for authority, both within Somerset Valley's walls and in the course of litigation.  (Claudio Aff. at ¶ 14 (demonstrating that Claudio, when questioned by her supervisor, Illis, "ignored her"); Claudio Dep. at 64-65, 69-70 (same)).[37]

The Court, however, cannot, based on the record, conclude that either Napolitano or Claudio present a serious and immediate threat to patient care.  Neither Napolitano nor Claudio has a lengthy disciplinary history of medical errors.  (See, e.g., SH Transcript 2 at 74, 125-26; SH Transcript 3 at 140.)  Further, as discussed in the last section of this Memorandum Opinion, each was disciplined and terminated immediately after the union election.

---

[37] The Court also notes that Claudio, throughout her deposition, acted belligerently and demonstrated a similar disregard for authority.  (See Claudio Aff. at 27 ("This is ridiculous.", 28 ("I'm not an idiot.  I'm very intelligent.  We can argue."), 66-67, 68 ("This is, like, you're kidding me."), 104-06, 112 ("I don't care if you want your questions answered.").)

The Court thus concludes, insofar as the Regional Director has asked the Court to reinstate the employment of Napolitano and Claudio, that the public interest in safeguarding the collective bargaining process outweighs the potential harm to the employer. The Court will thus issue an order temporarily reinstating Napolitano and Claudio.

The Court will not direct Somerset Valley to rescind or otherwise remove discipline from Napolitano's and Claudio's respective employee files. The Regional Director has not demonstrated that such relief is proper in the context of a Section 10(j) proceeding and, indeed, the Court believes that such a request for such relief, if proper, should have been made before the ALJ in the underlying unfair labor practices proceeding.

### 2.   Remedies Relating to Wells

The Regional Director also asks the Court to reinstate Wells, and to rescind and remove the discipline issued to Wells, as described above, from her employee record. In weighing the equities invoked by the Regional Director's request, however, the Court has determined that the reinstatement of Wells's employment would not be just and proper. This determination rests on two conclusions.

First, the public interest in safeguarding the bargaining process would not be significantly furthered by the reinstatement

of Wells's employment.  Wells was not a bargaining unit employee; she is not part of the group referenced in this Memorandum Opinion as the Somerset Valley workforce.  (ALJ Hearing Testimony at 1196; see also dkt. entry no. 26-7, Wells Aff. at ¶ 7.)  As such, her "reinstatement [would not] allow [an] unlawfully terminated employee[] to again become part of the bargaining process."  Cf. Aldworth, 124 F.Supp.2d at 293-94.  Further, unlike Napolitano and Claudio, Wells did not hold herself out as the voice of the Union; she did not act on behalf of the Union, for example, by answering employees' questions or distributing authorization cards.  Her reinstatement accordingly would have less comparative impact on the Somerset Valley workforce's trust in the reliability and/or sanctity of the bargaining process.

Second, the potential effect on Somerset Valley, i.e., on Somerset Valley's ability to provide adequate patient care, would be negatively impacted by Well's reinstatement.  The only experts to opine on the effects of her reinstatement, Bells and Isele, concluded that Wells repeatedly created confusion amongst the Somerset Valley staff and administration about staff schedules and assignments, thus creating the risks of absenteeism, inadequate care, and patient harm.  (See SH Transcript 2 at 126-29, 135; SH Transcript 3 at 18-19, 97-102, 107-09.)  Isele, in fact, described the scheduling risks associated with reinstating Wells's employment as "the single most frequent cause

124

of abuse and neglect in long-term care facilities." (SH
Transcript 3 at 99.)

Thus, after considering and weighing the equities invoked
by the Regional Director's request, the Court concludes that:
(1) the public interest in safeguarding the collective bargaining
process, inasmuch as it is invoked by the Regional Director's
request to reinstatement Wells's employment, is small; (2) the
potential harms created by such reinstatement are great; and
(3) the weighing of equities in this matter thus weighs against
the temporary reinstatement of Wells's employment.  The Court
will thus not order Somerset Valley to reinstate Wells's
employment during the pendency of the underlying administrative
proceedings or appeals therefrom.

    3.   Remedies Relating to Jacques

The Regional Director also asks the Court to reinstate
Jacques, and to rescind and remove the discipline issued to her,
as described above, from her employee record.  In weighing the
equities invoked by the Regional Director's request, however, the
Court has determined that the reinstatement of Jacques's
employment would not be just and proper.[38]  Although the Court

---

[38] Because the Court earlier concluded that the Regional
Director lacked reasonable cause to believe that Somerset Valley
violated Section 8(a)(3) by disciplining and discharging Jacques,
we need not reach this, the second step in Section 10(j)
analysis.  We nonetheless include this analysis to demonstrate
that Jacques, even upon a finding that the Regional Director had
reasonable cause to believe that Somerset Valley violated Section
8(a)(3) by disciplining and discharging Jacques, should not be
offered interim reinstatement.

reaches the same conclusion with respect to Jacques's employment
that it reached with respect to Wells's employment, the Court
reaches that conclusion for very different reasons.

The public interest in safeguarding the collective
bargaining process would be served, albeit only incrementally, by
reinstating Jacques.  Jacques, like Napolitano and Claudio, was a
member of the Somerset Valley workforce and a Union leader.
Thus, the reinstatement of her employment would tend to
"demonstrate that the reprisals against pro-union employees were
unlawful and will send the message that anti-union discrimination
will not be tolerated."  Aldworth, 124 F.Supp.2d at 294.  Such
demonstration, however, would only be incremental because the
crux of that message would already be served by the reinstatement
of Napolitano's and Claudio's employment.  While reinstating the
third of three Union leaders would may reinforce "the message
that anti-union discrimination will not be tolerated", such
reinstatement carries less weight than the original message.

By contrast, the potential impact on Somerset Valley of
reinstating Jacques's employment weighs heavily in the Court's
calculus.  The Court agrees with Isele that reinstating Jacques's
employment would be "absolutely contrary to the public interest",
i.e., to the interest served by Somerset Valley's continuous
provision of adequate patient care, because "to use a
colloquialism, 'she just doesn't get it.'"  (SH Transcript 3 at

126

95-96.)  Both before and after the union election, Jacques created the risk for patient harm by, <u>inter</u> <u>alia</u>, failing to document incident reports and failing to properly transcribe (or, simply, to transcribe) a doctor's order for patient medication. (ALJ Hearing Transcript at 567-71, 573-75; GC Ex. 46.) Furthermore, in at least one instance, Jacques's actions led to actual and very severe patient harm.  (<u>See</u> Resp. Ex. 10; ALJ Hearing Transcript at 597; SH Transcript at 214-15; SH Transcript 2 at 9.)

The Court, as shown by the decision to reinstate Napolitano's and Claudio's employment, does not look favorably upon discrimination based on Union support or activity.  The Court also, however, recognizes the public interest in protecting the health, safety, and welfare of patients entrusted to Somerset Valley's care.  In light of the many errors that Jacques committed while employed at Somerset Valley, the ongoing risk of patient harm that she created, and, as noted by Bell and Isele, the risk that she would continue to create risk of such harm, the Court finds that the impact that reinstating Jacques's employment would have on Somerset Valley and on its patients far outweighs the incremental public interest served by further safeguarding the collective bargaining process.

4.    Remedies Related to the Per Diem Employees

The Regional Director finally asks the Court to restore the hours worked by per diem employees Stubbs, Rodriguez, Aguilar, Joseph, and Onyeike.

The Court notes that the district court's function in a Section 10(j) proceeding is to preserve "the Board's ultimate remedial power". Chester, 666 F.3d at 99; see also Kobell v. Suburban Lines, Inc., 731 F.2d 1076, 1091 n.26 (3d Cir. 1984.) Indeed, we cognize that Section 10(j) should be reserved for "extraordinary cases" and is "not intended to undermine the normal processes of labor law adjudication: administrative resolution by the NLRB followed, if necessary, by enforcement in the courts of appeals." Kobell, 731 F.2d at 1091 n.26.  We thus focus not on the egregiousness of the unfair labor practices at issue but, instead, on the likelihood of ultimate remedial success. See id.  Where, as here, the Regional Director seeks greater relief than that issued by the Board -- here, the Regional Director seeks to restore hours worked by the aforementioned per diem employees, whereas the ALJ merely recommended that those employees receive compensation for lost hours -- the Court would not, in ordering such relief, act to preserve the Board's remedial powers.  This Court, accordingly, will not order any injunctive relief relating to per diem employment, either retroactive or prospective, and leaves the

128

final adjudication of those issues to the pending administrative appeal of the ALJ Decision.

The Court moreover notes that restoration of the established work schedules previously held by the per diem employees at issue would be inappropriate at this juncture.  These employees -- Stubbs, Rodriguez, Aguilar, Joseph, and Onyeike -- were classified by Somerset Valley as per diem employees.  The Regional Director has not challenged that classification.  As per diem employees, these employees were not entitled to hold established, "regular" work schedules; instead, Somerset Valley should have scheduled these employees only on an as-needed basis. (See ALJ Hearing Transcript at 1405-07, 2885.)  The Court would thus not, under any circumstances, have ordered restoration of the schedules previously held by these employees.

**CONCLUSION**

The Court, for the reasons set forth above, will grant the Amended Petition in part and deny it in part.  The Court will issue an appropriate order.

      s/ Mary L. Cooper      

**MARY L. COOPER**
United States District Judge


Dated: April 16, 2012

129